[No. B176271. Second Dist., Div. Seven. Aug. 11, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CORREY MITCHELL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[\*]]**

---

[*]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc J. Nolan and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

JOHNSON, J.—Defendant and appellant, Correy Mitchell, robbed a restaurant, carjacked a car, and led the police on a pursuit in the stolen car. A jury found Mitchell guilty of 14 criminal offenses, including assault with a firearm on a police officer and felony evading. The court sentenced him to 191 years in state prison as a "third strike" offender. Mitchell appeals, claiming admission of a police dispatch tape at trial violated his right to confrontation under the United States Supreme Court's decision in *Crawford v. Washington*.[1] The trial court found the tape admissible as a business record and the People argue it avoids *Crawford* error for that reason. We conclude the tape does not offend *Crawford* because of its content, not because it might qualify as a "business record." But in any event we find any such error would be harmless in this case. In the unpublished part of our opinion we address appellant's contention the trial court's imposition of upper terms and consecutive sentences deprived him of the right to a jury trial as mandated by *Blakely v. Washington*.[2] We find no prejudicial error and accordingly affirm.

FACTS AND PROCEEDINGS BELOW

*The Robbery*

About 9:40 p.m. on August 21, 2003, a man entered the kitchen area of Tony Roma's in Beverly Hills. He pointed a gun at the manager and declared he was robbing the restaurant. The robber "herded" the manager, Charles Donnelly, and several other employees into the restaurant's office at gunpoint. The other employees included Tom Fugedi, Ann Marie Lorenz, Jeremy Doyle, Jeivell Aguilar, and Luz Beato. Donnelly triggered the silent alarm as he entered the office.

Once everyone was in the office, the robber blocked the room's only entrance with his body while holding his gun. He ordered Donnelly to open

---

[1] *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354].
[2] *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531].

the safe. The robber gave Donnelly two minutes to empty the contents of the safe into a Tony Roma's takeout bag, which Fugedi gave him. Donnelly took out the first cash drawer but apparently was not moving quickly enough. The robber hit him on the back of the head with his gun. Donnelly stumbled and fell to his knees.

Donnelly then removed the money from two cash drawers and placed the cash into the Tony Roma's takeout bag. The robber ordered Donnelly to rip the phone out of the wall and asked where the exit was. Donnelly and Fugedi pointed it out. The robber told the people in the office, "Please don't follow me or I'll kill you. Stay in the office." He then left the restaurant with the takeout bag containing approximately $1,400 from the safe.

At trial, Donnelly read a statement about the robbery which he had written on the night of the incident. Donnelly's statement described the robber as "a black man, six-two to six-four, about 260 pounds." In his statement, Donnelly also described the robber as wearing blue jeans, a baseball cap, a long sleeve shirt, and a T-shirt and as carrying a silver automatic handgun. Donnelly gave the same description of the robber during his trial testimony. The other Tony Roma's employees named above also testified at trial and described the robber and the clothes he wore in nearly identical detail.

All the Tony Roma's employees who testified at trial remembered the robber's gun as being silver in color. Some employees recalled the gun was a semiautomatic. Donnelly, Fugedi, Lorenz, Doyle, and Aguilar each identified some of the clothing and the gun introduced into evidence as the clothing worn, and the gun used, by the robber.

*The Carjacking*

Between 9:45 and 9:50 p.m. on the night of the robbery, Benjamin Fish was in his red Honda Civic waiting to pull into an open parking spot on North Hamilton Drive. A tall man wearing a baby-blue plaid button-down shirt and jeans walked through the open parking spot and approached Fish's car. The man motioned to Fish to roll down the passenger side window. Fish rolled down the window. The man asked for directions. When Fish turned back to the window, the man was pointing a gun at his head. The man ordered Fish to get out of the car. Fish attempted to comply. However, he had forgotten to take off his seat belt, and he had not put the car in park. Fish struggled to exit the car as it started rolling. The carjacker threatened to kill him if he did not stop the car. Fish put the parking brake on and got out of the car. As Fish walked away, the carjacker got into Fish's car and drove away.

Fish testified he noticed a woman in a car who had been attempting to navigate around his car during the carjacking. After the carjacker drove away, this woman apparently called the police.

According to Police Detective Thomas Linehan's trial testimony, climbing over a wall outside the rear door of Tony Roma's would put a person on North Hamilton Drive a few buildings away from where the carjacking took place.

*The Police Pursuit*

Police dispatchers were notified of the robbery at 9:47 p.m. and of the carjacking at 9:50 p. m. A few minutes later, Officer David Armour saw Fish's red Honda Civic on San Vicente Boulevard. He verified the Honda's license plate number and told dispatch he had found the stolen car. Officer Armour followed the Honda as it pulled away from the curb. He waited for additional police units to assist him in stopping the car. When the other units joined him, all the officers activated the lights and sirens on their patrol cars. The police were directly behind the Honda. Nevertheless, the suspect failed to stop and a police pursuit ensued.

During the pursuit, the suspect at times drove on the wrong side of the street, ran red lights and stop signs, and drove through a fence. At some point, Officer Armour's patrol car experienced engine trouble. Officer Jason Dufour began to lead the chase. Shortly after, the suspect reached out the window while making a left-hand turn and fired his gun perpendicularly to his car. He then pointed the gun backwards, towards Officer Dufour's vehicle. Dufour swerved his car out of the way.

Eventually, the suspect entered a residential area near La Cienega Boulevard. The suspect circled around and then rolled out of the car while it was still moving. He was carrying a bag. The officers chased the carjacking suspect through an alley. Officer Dufour saw the suspect glance back and manipulate his bag. Dufour thought the suspect was going to shoot at the police, so he fired at the suspect. The suspect continued to flee. The suspect ran up to the balcony of an apartment building and was trapped by police officers surrounding the area. Officers took cover nearby and ordered the suspect to come down. The suspect threw down his bag and then came down from the balcony. He was arrested and taken into custody. The suspect arrested was appellant.

After appellant's arrest, the police found the red Honda Civic where it had gone through an iron fence and come to a stop at an apartment building. On the floor of the driver's side of the car, police found a nine-millimeter

semiautomatic handgun, a loaded magazine for the gun, and an expended shell casing. Police also retrieved the money appellant had dropped when he rolled out of the car. Near the balcony where appellant had been trapped, police found a white Tony Roma's takeout bag containing cash and a bundled up plaid shirt with money inside it. The money police found at the scene totaled $ 1,442.

At trial, several Tony Roma's employees, the carjacking victim, and two police officers identified appellant as the person who had respectively robbed, carjacked, and evaded them.

During Officer Armour's testimony, the prosecution played the police dispatch tape recording from the night of August 21, 2003. The voices of Officers Armour, Dufour, and Adams, the police air support officer, and the police dispatcher were pre dominant on the tape. Officers Armour, Dufour, and Adams testified at trial.

The jury found appellant guilty of one count of carjacking,[3] one count of second degree robbery,[4] five counts of assault with a semiautomatic firearm,[5] five counts of false imprisonment by violence,[6] one count of assault with a semiautomatic firearm on a peace officer,[7] and one count of evading an officer.[8] The jury also found true the allegations appellant had used a firearm in the commission of the offenses.[9] In a bifurcated proceeding, the court found true the allegations appellant had suffered two prior serious "strike" convictions within the meaning of the "Three Strikes" law.[10]

The court sentenced appellant as a third strike offender to a total of 191 years to life in state prison. As relevant to this appeal, the court imposed the upper term on certain counts and further exercised its discretion to impose consecutive terms on several of the counts.

---

[3] Penal Code section 215, subdivision (a), count 1. All further statutory references are to the Penal Code, unless otherwise noted.

[4] Section 211, count 2.

[5] Section 245, subdivision (b), counts 3, 5, 7, 9, and 11.

[6] Section 236, counts 4, 6, 8, 10, and 12.

[7] Section 245, subdivision (d)(2), count 13.

[8] Vehicle Code section 2800.2, subdivision (a), count 14.

[9] Section 12022.53, subdivision (b), counts 1, 2, and 13; section 12022.5, subdivision (a), counts 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12; section 12022.53, subdivision (c), count 13.

[10] Sections 667, subdivisions (b)–(i), 1170.12, subdivisions (a)–(d).

## DISCUSSION

### I. *ANY* CRAWFORD *ERROR FROM ADMITTING THE POLICE DISPATCH TAPE WAS HARMLESS BEYOND A REASONABLE DOUBT.*

On the second day of trial, the prosecution introduced a tape recording and transcript of a police dispatch tape which recorded the events of the night of August 21, 2003. On the tape, the police dispatcher and a police officer initially relayed information about the suspect in the Tony Roma's robbery. The dispatcher then announced, "Okay units, the suspect possibly just did carjacking [*sic*], Hamilton and Wilshire . . . taking a red Honda Civic . . . a male black with a handgun." Officer Armour was the first to respond, and he could be heard telling the dispatcher he had found the car. Throughout the pursuit which then unfolded, the police officers and the police air support officer constantly updated the dispatcher as to their locations. The air support officer began to direct the proceedings on the ground when the suspect rolled out of his car. Once the suspect was taken into custody, the dispatcher told air support the suspect was "wanted for armed 211, and probably an attempt murder on a police officer." The jury could hear the voices of Officers Armour, Dufour, and Adams among those on the tape. Those three officers testified at trial, but the other officers, including the dispatcher, did not.

Defense counsel objected to introduction of the dispatch tape. Counsel complained the dispatcher twice suggested the same suspect had done the carjacking and the robbery. Counsel argued the jury might conclude appellant had committed both the robbery and the carjacking based solely on the dispatcher's comments, inasmuch as the dispatcher's comments linked appellant to both crimes. Defense counsel pointed out the issue of guilt was for the jury, not the dispatcher, to decide. Defense counsel also complained about the many unauthenticated voices on the tape and claimed the tape constituted inadmissible hearsay.[11] Finally, defense counsel complained the dispatcher appeared to accuse appellant of a possible attempted murder on a police officer, and noted the attempted murder count had been dismissed before trial. Defense counsel urged the court to exclude the tape recording as more prejudicial than probative.[12]

---

[11] Evidence Code section 1200 defines hearsay evidence. This section provides:

"(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

"(b) Except as provided by law, hearsay evidence is inadmissible.

"(c) This section shall be known and may be cited as the hearsay rule."

[12] Counsel based this exclusionary argument on Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially

The prosecutor argued the voices on the dispatch tape were admissible as "spontaneous statements"[13] or "contemporaneous statements."[14] The prosecutor also argued the tape was not hearsay at all because it was not admitted to prove the truth of the matter asserted.[15] The prosecutor pointed out the officers on the tape were "explaining what's going on as they see it," so the tape was not hearsay. Instead, the prosecutor argued, the evidence was probative and should be admitted because "it explains the entire evading and explains everything that is going on." The prosecutor also argued the tape "shows the state of mind of the officers and why they reacted this way, why they pursued this person. " Finally, the prosecutor noted the officers on the tape did not say the suspect was definitely the same person who committed the robbery.

In response to questioning by the court, defense counsel conceded the foundational requirements of the "business record" exception to the hearsay rule had been established for the dispatch tape.[16] Ultimately, the court ruled: "The evidence is clearly admissible. It's a business record. It's made at or near the time. There are qualifications with regard to all the language that's used. Obviously, I've already indicated to the jury that it's their obligation to not consider the fact that the defendant has been arrested or charged or the suppositions of any of these individuals has no bearing on their evaluation as to whether or not he's the person, and there are qualifications within the tape itself as to whether or not there is a connection or not.

---

outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[13] Evidence Code section 1240 is the so-called spontaneous statement exception to the hearsay rule. This section provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

[14] Evidence Code section 1241 is known as the "contemporaneous statement" exception to the hearsay rule. This section provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Is offered to explain, qualify, or make understandable conduct of the declarant; and

"(b) Was made while the declarant was engaged in such conduct."

[15] See Evidence Code section 1200, subdivision (a), *ante*, footnote 11.

[16] Evidence Code section 1271, known as the "business record" exception to the hearsay rule, provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

"The fact that a police officer may have drawn some inferences from those things, those are natural inferences that a police officer may have derived, but obviously their [*sic*] inferences that they draw aren't relevant to the jury."

The court offered to instruct the jury about what issues were relevant and could be considered. Defense counsel requested the court do so. The court gave the jury a special limiting instruction emphasizing the role of the jury alone in deciding a suspect's guilt. Specifically, the court instructed the jury:

"You just heard the dispatch tape related to three alleged incidents that purportedly took place. One relates to the Tony Roma's, part of it relates to an alleged carjacking that took place on Hamilton, and the last one relates to an alleged evading of police officers.

"The impressions of the police officers, the actual descriptions as to what's happening, obviously, on this tape, you are permitted to consider as you would any other evidence in the case.

"But the difference is that there would be impressions or inferences that police officers may have drawn which are referenced in the tape. It's up to you to decide if there was a crime committed in this case, not up to a police officer who talks about it on a tape. It's up to you to decide what that crime is, if any, and who committed it. And whether or not any police officer makes reference to any specific crime or crimes on that tape is in the police officer's own head. That's not what you use to decide this case. [¶] . . . You decide what happened on this particular night and no one else."

Appellant claims admission of the police dispatch tape and the dispatcher's testimonial hearsay statements constituted *Crawford*[17] error because he was deprived of his right to confront and cross-examine his accusers on the tape.

The Supreme Court handed down its decision in *Crawford* two weeks before appellant's trial began. Appellant could have raised a confrontation clause objection at trial but did not. Therefore, he has technically forfeited the right to raise the issue on appeal.[18] Our decision, however, need not rely on this technical flaw.

---

[17] *Crawford v. Washington, supra*, 541 U.S. 36.

[18] See *United States v. Olano* (1993) 507 U.S. 725, 731 [123 L.Ed.2d 508, 113 S.Ct. 1770] (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' "; *People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093]" (an appellate court will ordinarily not consider errors if an objection could have been, but was not, presented to the lower court).

## A. *The Supreme Court's* Crawford *Decision.*

■ In *Crawford v. Washington*,[19] the United States Supreme Court rejected the notion an unavailable witness' out-of-court statement could be admitted against a criminal defendant as long as the statement had adequate "indicia of reliability."[20] The Supreme Court instead held admission of testimonial evidence from a witness who does not testify violates the confrontation clause, unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination.[21]

■ The court declined to define what evidence is "testimonial." It did, however, explain the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[22] The court explained the confrontation clause historically was aimed at protecting against similar abuses, such as the use of ex parte examinations as evidence against the accused.[23]

■ According to the court's historical analysis, the text of the confrontation clause reflects particular concern for a "core class" of testimonial statements.[24] The court presented some formulations of this "core class," including (1) " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' "; (2) " 'extra-judicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' "; (3) " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' "; and (4) "[s]tatements taken by police officers in the course of interrogations."[25]

■ The court also acknowledged not all hearsay evidence implicates the core concerns of the Sixth Amendment.[26] The court noted, "there is scant evidence that exceptions [to the exclusion of hearsay evidence] were invoked to admit *testimonial* statements against the accused in a *criminal* case. Most

---

[19] *Crawford v. Washington, supra*, 541 U.S. 36.
[20] *Crawford v. Washington, supra*, 541 U.S. 36, 60–62, overruling *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531].
[21] *Crawford v. Washington, supra*, 541 U.S. 36, 68.
[22] *Crawford v. Washington, supra*, 541 U.S. 36, 68.
[23] *Crawford v. Washington, supra*, 541 U.S. 36, 50, 68.
[24] *Crawford v. Washington, supra*, 541 U.S. 36, 51.
[25] *Crawford v. Washington, supra*, 541 U.S. 36, 51–52.
[26] *Crawford v. Washington, supra*, 541 U.S. 36, 51.

of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy."[27] Nontestimonial statements remain subject to state hearsay law, and may be exempted from confrontation clause scrutiny altogether.[28]

### B. Designation As a "Business Record" Is Inadequate to Determine Whether the Police Dispatch Tape Was Properly Admitted Under Crawford.

As noted, the court admitted the police dispatch tape into evidence as a business record. The People argue this was proper. Classification as a "business record," however, does not alone determine whether this type of evidence is admissible as nontestimonial under *Crawford*. In *Crawford*, the Supreme Court noted business records were one example of hearsay statements that by their nature were not testimonial. By this the court could not have meant all documentary evidence which could broadly qualify in some context as a business record should automatically be considered nontestimonial.[29] Thus, the questions before a court are more properly whether the business record in question nevertheless contains testimonial evidence and whether the record is admissible in compliance with *Crawford*'s requirements.

Since *Crawford*, courts have struggled to determine what types of "business records" can be considered testimonial and what types are not testimonial. For example, courts have agreed latent fingerprint reports are business records but have split on whether such reports are testimonial.[30] Similarly, courts have categorized blood-alcohol reports and autopsy reports as public records or business records, since they are made in the course of a laboratory's business, but they have admitted such records as nontestimonial evidence for a variety of other reasons.[31]

---

[27] *Crawford v. Washington, supra*, 541 U.S. 36, 56, footnote omitted.

[28] *Crawford v. Washington, supra*, 541 U.S. 36, 68; see, e.g., *People v. Corella* (2004) 122 Cal.App.4th 461, 467 [18 Cal.Rptr.3d 770] "[a]fter *Crawford*, a 'nontestimonial' hearsay statement continues to be governed by the *Roberts* standard".

[29] *Crawford v. Washington, supra*, 541 U.S. 36, 56; but see, e.g., *Johnson v. Renico* (E.D.Mich. 2004) 314 F.Supp.2d 700, 707 (the defendant's statements to the police during booking were not testimonial, even under *Crawford*, because they were admitted pursuant to a business records exception).

[30] Compare *State v. Arita* (La.Ct.App. 2005) 900 So.2d 37, 45 (latent fingerprint report was a public record and was nontestimonial hearsay evidence) with *People v. Hernandez* (2005) 794 N.Y.S.2d 788, 789 [7 Misc.3d 568] (latent print report may have been a business record, but it was testimonial because the fingerprints "were taken with the ultimate goal of apprehending and successfully prosecuting a defendant").

[31] See, e.g., *State v. Dedman* (N.M. 2004) 102 P.3d 628, 636 [2004 NMSC 37], (blood-alcohol report was not testimonial evidence because it was not generated by law enforcement

■ In evaluating the admissibility of business records, courts have generally looked to the purpose for which a document was produced. For example, in *People v. Taulton*, the Court of Appeal reasoned a business record was not testimonial because "[t]he purpose of such a writing is to prepare a record of an act or event pertaining to a business, not to provide evidence."[32] If a record was produced "with an eye toward trial" or specifically for use in a criminal prosecution, however, courts have generally found the record testimonial.[33]

■ In cases involving 911 calls, which are analogous to police dispatch tapes insofar as they may contain spontaneous statements, courts have also disagreed whether witness statements are testimonial.[34] Some courts have held statements made by a witness during a 911 call are nontestimonial because they are not made in response to formal or structured police questioning or in contemplation of future use at trial.[35] A few courts have instead reasoned such statements are not testimonial when the witness has not had time to consider the legal ramifications of making a statement or to reflect and falsify the account.[36] Other courts have found witness statements during 911 calls testimonial because the 911 dispatcher takes information in a

---

agents and was not prepared for use at trial); *Moreno Denoso v. State* (Tex.App. 2005) 156 S.W.3d 166, 182 (statements within an autopsy report which set forth the location and nature of decedent's injuries and the cause of death were not testimonial because the report was not prior testimony or a statement given in response to police interrogation); *People v. Durio* (2005) 794 N.Y.S.2d 863, 868–869 [7 Misc.3d 729] (autopsy report was not testimonial, and was admissible despite the absence of the report's preparer, because it was not manufactured for the benefit of the prosecution).

[32] *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1224 [29 Cal.Rptr.3d 203], petition for review pending, petition filed July 1, 2005 (holding public records such as records of prior convictions nontestimonial).

[33] See *Crawford v. Washington, supra*, 541 U.S. 36, 56, footnote 7 ("[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse"); *id.*, at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); see also, *People v. Rogers* (2004) 780 N.Y.S.2d 393, 397 [8 A.D.3d 888], (report giving the results of testing on a victim's blood was testimonial because "the test was initiated by the prosecution and generated by the desire to discover evidence against defendant"); *People v. Hernandez, supra*, 794 N.Y.S.2d 788, 789; compare *State v. Dedman, supra*, 102 P.3d 628, 636; *People v. Durio, supra*, 794 N.Y.S.2d 863, 868–869.

[34] The California Supreme Court has granted review in several cases dealing with the implications of *Crawford*, including *People v. Caudillo*, review granted January 12, 2005, S129212, a case involving 911 calls.

[35] See *People v. Corella, supra*, 122 Cal.App.4th 461, 468–469; *People v. Moscat* (2004) 777 N.Y.S.2d 875, 879–881 [3 Misc.3d 739].

[36] See *People v. Conyers* (2004) 777 N.Y.S.2d 274, 277 [4 Misc.3d 346].

formal way and the purpose of taking the information is investigation, prosecution, and possible use at a judicial proceeding.[37]

■ If evidence is found testimonial, *Crawford* mandates the witness who prepared the document or made the statement must testify at trial and be subject to cross-examination unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination.[38]

### C. *Most of the Dispatch Tape Does Not Implicate the Confrontation Clause at All.*

The majority of the statements heard on the dispatch tape are those of Officers Armour, Dufour, and Adams. These police officers testified at trial and were subject to cross-examination. Accordingly, admission of their statements on the tape did not violate the confrontation clause or the principles announced in *Crawford*.

Moreover, the bulk of the remainder of the dispatch tape was not offered to establish the truth of the matter asserted in any event.[39] Instead, the prosecution offered the tape to show how the pursuit unfolded and to describe the police officers' actions. The beginning of the tape recorded the officers' statements regarding recognition of the stolen car and their statements about organizing a traffic stop. Throughout the pursuit, the officers simply called out their locations and their directions of travel. Once the officers began pursuing appellant on foot, the tape recorded the air support officer shouting directions and instructions to the officers on the ground. The tape was not offered to prove the chase involved driving down San Vicente Boulevard or turning on La Cienega Boulevard. Nor was it offered to prove the air support officer, rather than the officers on the ground, was responsible for calling appellant out of his hiding place on the balcony. The truth of these matters, and others like them discussed on the tape, was immaterial to any contested matter in the trial.

■ Because the vast majority of the tape was not offered to establish the truth of the matter asserted, much of the tape is not hearsay at all. As nonhearsay, and therefore nontestimonial evidence, a great portion of the police dispatch tape is not subject to the analysis in *Crawford*.[40] The court in *Crawford* noted the confrontation clause "does not bar the use of testimonial

---

[37] See *People v. Cortes* (2004) 781 N.Y.S.2d 401, 406–407, 415 [4 Misc.3d 575].

[38] *Crawford v. Washington, supra*, 541 U.S. 36, 68; see also, *People v. Rogers, supra*, 780 N.Y.S.2d 393, 397 (reversing the defendant's conviction and remanding for a new trial based on admission of blood test results in the absence of the report's preparer).

[39] See Evidence Code section 1200, subdivision (a), *ante*, footnote 11.

[40] *Crawford v. Washington, supra*, 541 U.S. 36, 68.

statements for purposes other than establishing the truth of the matter asserted."[41]

The remaining portion of the tape contains the dispatcher's two comments linking appellant to both the robbery and the carjacking and suggesting the possibility of charging appellant with attempted murder of a police officer. Even assuming the dispatcher's comments on the tape or some of the officers' comments were based on statements witnesses made to them and conceivably could be construed as testimonial within the meaning of *Crawford*, we would nevertheless find those comments were incidental and harmless beyond a reasonable doubt.

### D. *If Admission of the Police Dispatch Tape Constituted Error at All, It Was Harmless Beyond a Reasonable Doubt.*

A violation of the confrontation clause is subject to harmless-error analysis.[42] In *Chapman v. California*, the United States Supreme Court stated, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."[43] The Supreme Court in *Delaware v. Van Arsdall* applied the *Chapman* test to a confrontation clause violation and listed several factors courts should consider in determining whether such an error is harmless beyond a reasonable doubt.[44] Some of these factors are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."[45] In

---

[41] *Crawford v. Washington, supra*, 541 U.S. 36, 60, footnote 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 105 S.Ct. 2078] [the nonhearsay aspect of a confession does not raise confrontation clause concerns].

[42] *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684 [89 L.Ed.2d 674, 106 S.Ct. 1431] ("[W]e hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."); see also, *Coy v. Iowa* (1988) 487 U.S. 1012, 1021 [101 L.Ed.2d 857, 108 S.Ct. 2798] ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis . . . and see no reason why denial of face-to-face confrontation should not be treated the same."); *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1012, footnote 4 [232 Cal.Rptr. 132, 728 P.2d 202] ("Recently, the United States Supreme Court . . . confirmed that the Sixth Amendment right to confrontation should be measured by a harmless error standard.").

[43] *Chapman v. California, supra*, 386 U.S. 18, 24.

[44] *Delaware v. Van Arsdall, supra*, 475 U.S. 673, 684.

[45] *Delaware v. Van Arsdall, supra*, 475 U.S. 673, 684.

analyzing each of these factors in the case at bar, we conclude even if the police dispatch tape was testimonial and there was error in admitting it at trial without allowing for cross-examination, such error was harmless beyond a reasonable doubt.

The dispatch tape played only a minor role in the prosecution's case. The tape did not provide any new evidence because there was so much other physical and testimonial evidence presented at trial to prove the robbery, the carjacking, and the police pursuit. In fact, much of the dispatch tape simply allowed the jury to hear the location and direction of the police vehicles during the pursuit and the police officers' strategy for taking the suspect into custody. The police officers who testified gave the same information about the pursuit and the arrest. The dispatch tape was simply the icing on the cake, clarifying the chronology of the night's events.

As appellant concedes, the information on the dispatch tape was merely cumulative of the witnesses' trial testimony. Most of the information on the tape concerned the streets officers were driving on and the direction they were traveling. Both Officer Armour and Officer Dufour repeated this information in their trial testimony. During Officer Dufour's testimony, the prosecution also played a videotape of the pursuit taken from Dufour's police car. Thus, the jury did not need to rely on the police dispatch tape to convict appellant of felony evading.

During the trial, Officers Armour, Dufour, and Adams all testified about appellant's arrest. The prosecution also showed a Fox 11 video of the arrest, which Officer Armour explained during his testimony. The jury would thus have had many opportunities to see and hear about the circumstances of appellant's arrest with the stolen loot, even if they had not heard the police dispatch tape.

It is true the police dispatcher seemed to link the suspect in the Tony Roma's robbery to the person who stole Benjamin Fish's red Honda Civic. But any reasonable juror could have drawn the same inference from the concededly admissible evidence and connected the Tony Roma's robbery with the carjacking. Several of the Tony Roma's employees testifying at trial gave descriptions of the robber which matched appellant's physical character- istics and the clothing he wore when arrested. Almost all of the Tony Roma's employees also identified appellant as the robber at trial. Fish, the carjacking victim, described the suspect's appearance on the night of the crime in nearly identical terms as did the Tony Roma's employees. He, too, identified

appellant as the carjacker. Of course, the fact appellant had both the Tony Roma's takeout bag full of money and Fish's stolen car provided the strongest link of all between the two crimes. In these circumstances, the dispatcher's comment linking the robbery to the carjacking could not have made a difference.

Similarly, the dispatcher's statement about a possible attempted murder charge against appellant was duplicated in Officer Dufour's testimony about the pursuit. As Dufour repeatedly testified, appellant shot at the police during the chase. The video footage taken from Dufour's car, which was admitted without objection, also showed the gunshot as a puff and a flash of light. Thus, the members of the jury could see and hear for themselves appellant had shot at Officer Dufour. The jury did not need the dispatcher to characterize the shooting, because they heard about it from Officer Dufour himself.

In short, virtually all the evidence on the dispatch tape was merely cumulative to other properly admitted evidence.

Furthermore, an abundance of other evidence corroborated the dispatcher's comments linking the robbery suspect to the carjacking suspect. Not only did an uncontroverted chain of in-court testimony link appellant to all the crimes of which he was convicted, but appellant was also caught red-handed with physical evidence of his crimes. At the end of the police pursuit, appellant rolled out of a red Honda Civic with the same license plate as Benjamin Fish's red Honda Civic. There could be no doubt it was the same car taken from Fish earlier in the night.

Police also discovered a gun in the car. The gun, a silver semiautomatic handgun, matched many of the witnesses' descriptions of the weapon used in the crimes.

After appellant rolled out of the car, police officers chased him onto a balcony, and appellant threw down a Tony Roma's takeout bag with money in it. Appellant's possession of a Tony Roma's bag directly linked him to the first crime, the robbery. It also did so in a far more compelling fashion than did the dispatcher's tentative statement proposing a possible link between the robbery and the carjacking. Furthermore, the amount of money collected from the bag, from the plaid shirt appellant had been wearing, and from the area where appellant had exited the car totaled $1,442. Approximately $1,400 had been taken from Tony Roma's in the robbery.

The timing and location of the crimes also made it clear the same person probably committed the robbery and the carjacking. Detective Thomas Linehan of the Beverly Hills Police Department told the jury there was a wall outside the rear door of Tony Roma's. The wall was about six feet high. The detective testified if a person climbed over the wall, the person would be behind the buildings on North Hamilton Drive. Detective Linehan explained there was a walkway between two of the buildings, so a person could get to the street after climbing over the wall. The carjacking took place about four buildings south of the wall, on the opposite side of the street. From this evidence, the jury could easily conclude it was possible for appellant to get from Tony Roma's to the location of the carjacking in the few minutes between the events.

We also note appellant was permitted to cross-examine eyewitnesses to the events related on the dispatch tape. Several of the Tony Roma's employees appeared at trial, as did the carjacking victim and three of the officers whose voices were heard on the tape. Appellant had the opportunity to cross-examine each of the witnesses who testified at trial.

Furthermore, the court instructed the jury to disregard the objectionable portions of the tape. The jurors presumably followed the court's instruction and did not rely on the dispatcher's statements to render their verdict.[46]

In sum, the prosecution's case was strong enough for the jury to convict appellant even if the entire dispatch tape was excluded. The properly admitted evidence was so compelling, any error in admission of the police dispatch tape must be deemed harmless beyond a reasonable doubt.[47]

## II. *THE COURT DID NOT COMMIT* BLAKELY *ERROR BY IMPOSING UPPER TERMS AND CONSECUTIVE SENTENCES.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[46] See *People v. Pinholster* (1992) 1 Cal.4th 865, 925 [4 Cal.Rptr.2d 765, 824 P.2d 571] ("The presumption of prejudice may be dispelled by an admonition to disregard the improper information. . . . We generally presume that jurors observe such instructions.").

[47] *Chapman v. California, supra,* 386 U.S. 18, 24; *Delaware v. Van Arsdall, supra,* 475 U.S. 673, 684.

[*]See footnote, *ante,* page 1210.

## DISPOSITION

The judgment is affirmed.

Perluss, P. J., and Zelon, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 16, 2005.