[No. B190720. Second Dist., Div. Two. Feb. 15, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
MICHAEL ARTHUR COOPER, Defendant and Respondent.

COUNSEL

Steve Cooley, District Attorney, Lael Rubin and Tracey Lopez, Deputy District Attorneys, for Plaintiff and Appellant.

Robert W. Walters for Defendant and Respondent.

OPINION

**CHAVEZ, J.**—The People appeal from the order dismissing the information charging Michael Arthur Cooper with one count of theft from an elder or dependent adult (Pen. Code, § 368, subd. (e)).[1] It was also alleged that he misappropriated in excess of $50,000 within the meaning of section 12022.6, subdivision (a)(1). The People contend that the trial court erred (1) in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

excluding, in their entirety, two videotaped interviews of the victim on the ground that they violated defendant's right to confront the witnesses against him, as described in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*); (2) in excluding the portion of one of the videotapes depicting a tour of the victim's home to document its condition; and (3) in excluding the testimony of the People's expert psychologist who was going to render an opinion on the victim's mental capacity, because the opinion relied, in part, upon the videotapes that were inadmissible under *Crawford*.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On August 30, 2004, the district attorney filed an information against defendant, alleging one count of theft from an elder or dependent person, between April 1, 2001, and March 26, 2003, and including an allegation that more than $50,000 was misappropriated. The facts on which the information was based are as follows.

Mathilda Nelson (Nelson) was born in 1910 and resided alone in the home that she owned in Monrovia. She was an only child and had no family. At all relevant times, she was unable to drive. Nelson had numerous medical ailments, including high blood pressure, arthritis, renal disease, anemia, and a hypothyroid condition.

Defendant, Nelson's neighbor, knew her since the late 1980's. In the relevant time period he assisted with her errands, grocery shopping, meal preparation, and bill paying. As time passed, defendant became more involved in Nelson's affairs. On April 2, 2001, she executed a durable power of attorney form in his favor. Seven months later, he took her to an attorney to discuss her establishing a trust. On August 13, 2002, Nelson executed a Wells Fargo power of attorney allowing defendant to draw on her accounts at that bank. On October 15, 2002, she executed a will leaving defendant her house and a revocable trust of which he was sole beneficiary.

Beginning in 2001, police received anonymous reports that Nelson might be a victim of elder abuse. Detectives visited her home to check on her welfare on multiple occasions. On each, they concluded that the reports were

---

[2] Because this matter was not tried, the facts are distilled from defendant's preliminary hearing, held between August 9 and August 13, 2004, transcripts of witness interviews, and other documents in the appellate record. We decline to consider defendant's statement of facts, which fails to cite to the record, in violation of California Rules of Court, rule 8.204(a)(1)(C), formerly rule 14(a)(1)(C).

unfounded. At one visit, on April 10, 2001, the investigating detective noted that Nelson misstated her age by 10 years, though he nonetheless concluded that she had no problem caring for herself and communicating. During a subsequent investigation, on October 19, 2001, another detective found that Nelson engaged in repetitive questioning, though he saw no evidence of abuse. An attorney, consulted in November 2001 to prepare a trust for Nelson, concluded that she lacked contractual and testamentary capacity due to short- and long-term memory loss and that the attorney could not therefore prepare a trust for her.

Among other evidence, the prosecution intended to introduce at trial (1) two videotaped interviews of Nelson, (2) a videotaped tour of Nelson's home, and (3) the testimony of an expert psychologist on Nelson's mental capacity, which evidence is as follows.

*Nelson's first videotaped interview*

On February 26, 2003, Detective Dorothy Percy, an elder abuse detective, visited Nelson's home with a multidisciplinary team from Genesis and Adult Protective Services, which included a social worker and a nurse. They conducted a videotaped interview with Nelson (February interview) and a tour of her residence.

Nelson reported that she was an only child, born in Chicago in 1910. Her husband, also an only child, died 20 years earlier. Nelson repeated numerous times during the interview that she trusted defendant implicitly, that he was her friend, took her grocery shopping and to doctors, helped her with banking, and paid her bills.[3] She said that when she died she wanted him to have her home. Nelson acknowledged giving defendant money to pay her bills, but not for himself. She said she did not pay him to run errands. She did not know if she had given him legal authority to do things for her in an emergency and did not believe defendant took money from her accounts.

During the interview, Nelson showed signs of memory loss. For example, she did not remember what the team was doing at her house; that she lived in Monrovia; how long she lived in the house that she owned; the last time she had seen a doctor; who her doctor was; who the beneficiary of her insurance was; if she had given legal authority to defendant regarding her finances, although she knew she had accounts at Wells Fargo Bank; consulting with any attorney; the year (without looking at a newspaper for reference); her Social Security number; that she had high blood pressure for which she took

---

[3] Nelson said, "I would trust Michael with my last dollar" and that she "depend[ed] on him for everything."

medication; or the number to call in case of fire. She did not know how much income she had every month because "the checks go right to the bank," although she was aware that she received Social Security.

During the interview, Detective Percy observed Nelson's check register and some bank statements and was permitted by Nelson to take them. She also later obtained bank records from Life Services Private Caretaker. Detective Percy found suspicious transactions in Nelson's accounts, including checks written to defendant for a roof heater and other repairs totaling $7,071 and an increase in the number of checks written to him after he obtained Nelson's power of attorney. Detective Percy found that defendant averaged taking $1,400 per month from Nelson's accounts, although her monthly expenses were between $162 and $229. The total amount of all checks to defendant and withdrawals by him during the alleged time period was $60,764.32.

The Genesis team conducted a "Folstein mini-mental" evaluation of Nelson to determine if she was mentally impaired. The evaluation revealed that Nelson had difficulty remembering three words after performing simple mathematical tasks. She also had difficulty drawing clock hands to reflect a specified time.

The camera tour of Nelson's home revealed that the house was extremely clean, the floors and kitchen spotless, the furniture shiny, the couches covered, and a clean towel in the bathroom. The toilet in the bathroom was stained, and there was an old stain on the ceiling, suggesting a past leak.

As a result of this visit, social services obtained medical treatment for Nelson's high blood pressure and, on March 27, 2003, Life Services Private Caretaker replaced defendant as her court-appointed conservator.

*Nelson's second videotaped interview*

On June 17, 2003, Detective Percy returned alone to Nelson's residence and conducted a second videotaped interview (June interview). During this interview, Nelson's attitude towards defendant had completely changed. She believed he was taking advantage of her and her money and no longer trusted him. She made statements like, "I don't believe he is a trustworthy person. I believe he only believes in himself. He is a self-centered person. He will help no one but Michael. . . . He wouldn't help me, I could be dying. He wouldn't help. He wouldn't really help me. . . . He's not genuine." Nelson denied giving defendant permission to take money from her account and asked, "Why would I give him large sums of money? I'm not—I haven't lost my brains yet. Why?" But, when asked if she paid defendant to care for her she said, "Truthfully, I can't answer that. I don't know for sure."

Nelson reflected continuing memory impairment. She said that Zenaida Vakian, her caregiver, was very helpful. But later in the interview, she did not know who Vakian was. She did not remember Detective Percy from the prior visit or that she was a police officer; did not know if she had any money or where she got it; what month or year it was; the restaurant she went to for her birthday; or if defendant visited her anymore. Nelson did not know she had anything of value to bequest.

*The People's expert*

The district attorney retained a clinical psychologist specializing in neuropsychology and geriatrics, Dr. Temperance Evans, to evaluate Nelson's mental capacity. Dr. Evans reviewed approximately 60 items, including information from the attorney Nelson had previously consulted for a trust, the February and June interviews, police reports, financial records, medical and legal records, and the mini-mental evaluation conducted during the February interview. In reviewing the medical records, Dr. Evans found that Nelson suffered from numerous ailments including high blood pressure, hypothyroid, renal disease and anemia, all of which could affect her cognition. She reviewed the Genesis report which stated that Nelson was dirty and that the house was dusty and that she had impaired reasoning and judgment and made things up when she did not know the answer, which is common with dementia. Nelson did not know that defendant was executor of her will, that she had given him a durable power of attorney, or how much money she had given to him.

Dr. Evans also interviewed Nelson's neighbors, the Boardmans, and Vakian. The Boardmans reported that Nelson's cognition had declined in the previous five years and that she isolated herself more. Vakian reported that defendant told Nelson that her neighbors were bad people.

On or about October 30, 2003, Dr. Evans interviewed Nelson and conducted a mini-mental evaluation that she compared with that done during the February interview. She reviewed Nelson's check register and observed that the months were in the wrong order, and the check numbers were not in sequential order. Nelson was unable to name the President or Governor, her zip code, telephone number, or her age. She knew she had two accounts at Wells Fargo Bank but did not know how much was in them. She was unaware she had a caregiver, although the caregiver had been with her for six months.

Dr. Evans opined that Nelson lacked the capacity to understand the true nature of her financial acts at the time she executed the documents in favor of defendant. She also believed that Nelson was susceptible to undue

influence because she was over age 75, had medical problems, had no third party advisors, and could not drive. She admitted that a significant part of her opinion was based upon the videotaped interviews. Dr. Evans concluded that Nelson's decline was very gradual, as the two videotaped interviews showed little significant difference in Nelson's responses. Her score was identical on the February and October 2003 mini-evaluations, reflecting moderate impairment.

*Defendant's motion to exclude videotapes and expert*

Nelson died on January 4, 2005. On January 6, 2006, prior to trial, defendant made an in limine motion to exclude Nelson's videotaped interviews and the testimony of Dr. Evans and those in attendance at the February interview. Defendant argued that the two videotapes were "100 percent inadmissible under *Crawford*" because they were interviews of the victim conducted by the police, which made them completely testimonial. He also argued that Dr. Evans's opinions were based upon them and that she should therefore not be allowed to testify.

The prosecution stated that it only wanted to admit portions of the videotapes, agreeing that some parts had to be excluded because of *Crawford*. It argued that the mini-mental evaluation portion of the videotape was discrete, was conducted by other than law enforcement, and should be admitted. It also sought to use the February videotape to document the cleanliness of the house before and after the caregiver became involved.

*Ruling*

The trial court ruled that (1) both tapes were testimonial under *Crawford*, because the police were at the house to "set up a prosecution against Mr. Cooper" and were therefore excluded; (2) all interviews with the victim were excluded because the statutory hearsay exception for the victim of elder abuse, codified in Evidence Code section 1380, was held by the Court of Appeal to be unconstitutional; (3) Dr. Evans could not testify because she interviewed Nelson, relied on the videotaped interviews, and was acting at the behest of the police; and (4) the medical workers who conducted the tests on the videotapes could not testify about those tests but could only testify about the condition of the home. As a result of the ruling, the People could not proceed, the trial court dismissed the information, and the People appealed the dismissal.

## DISCUSSION

### I.  *Videotaped interviews*

The People contend that the trial court erred in excluding the videotapes of the February and June interviews in their entirety, arguing that only "testimonial hearsay" offends the confrontation clause and that substantial portions of those interviews are not testimonial hearsay. The People request that we order the trial court to permit admission of those portions of the videotaped interviews that contain Nelson's mental evaluation, her statements of nonrecollection, and her erroneous factual statements because they were not offered for the truth of the matter asserted but to reflect her mental capacity. By the same logic, the People request that we order the trial court to permit Detective Percy or the other people present at the February interview to testify regarding medical tests and mental evaluations conducted during that interview. We agree that the confrontation clause does not preclude the requested evidence.

### A.  *Standard of review*

We review the exclusion of evidence for abuse of discretion. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 31–32 [24 Cal.Rptr.3d 233].)

### B.  *The confrontation clause*

▪ The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The phrase "witnesses against him" is not limited to in-court witnesses, but also applies to the admission of hearsay statements. (See *Crawford, supra,* 541 U.S. at pp. 50–51.) The object of the confrontation clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845 [111 L.Ed.2d 666, 110 S.Ct. 3157].)

In *Crawford,* the United States Supreme Court overruled *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], which had allowed out-of-court statements to be admitted at trial upon a showing of sufficient indicia of reliability. (*Crawford, supra,* 541 U.S. at pp. 60–67.) The Supreme Court concluded that with regard to nontestimonial hearsay, the *Roberts* approach was acceptable; such statements remain subject to state hearsay law and may be exempted from confrontation clause scrutiny entirely. (*Crawford, supra,* at p. 68.) But where testimonial evidence is involved, "the Sixth

Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."[4] (*Ibid.*)

█ While the Supreme Court left for another day any effort to spell out a comprehensive definition of " 'testimonial' " (*Crawford, supra*, 541 U.S. at p. 68), it stated that it includes " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "[5] (*Id.* at p. 52.) The court stated that "at a minimum" the term "testimonial" applies "to police interrogations." (*Id.* at p. 68.)

In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), the day arrived for the Supreme Court to elaborate on what constitutes testimonial statements and to "determine more precisely which police interrogations produce testimony" subject to the confrontation clause. (*Id.* at p. 822 [126 S.Ct. at p. 2273].) In *Davis*, the trial court admitted into evidence a recording of the statements made by a domestic violence victim in response to a 911 telephone operator's questions regarding what had occurred during a domestic violence incident that was the subject of the call, including circumstances at the house at the time of the call, the identity of the perpetrator, what he was doing, why he was at the house, whether he was armed, and a description of the assault. (*Id.* at pp. 818–819 [126 S.Ct. at p. 2271].) Answering the question left open in *Crawford*, the Supreme Court concluded that the confrontation clause applied only to testimonial hearsay.[6] (*Davis, supra*, at pp. 822–825 [126 S.Ct. at pp. 2274–2275].) It was therefore required to determine if the victim's statements in the 911 call were testimonial.

---

[4] *Crawford* left open the question of whether the confrontation clause had any application to nontestimonial hearsay. (*Crawford, supra*, 541 U.S. at p. 61.)

[5] *Crawford* also stated that, "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . [¶] Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " (*Crawford, supra*, 541 U.S. at p. 51.)

[6] *Crawford* presaged this conclusion when it noted that "testimonial *hearsay*" (italics added) was the "primary object" of the confrontation clause (*Crawford, supra*, 541 U.S. at p. 53) and stated in a footnote that, "The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Id.* at p. 59, fn. 9.) *Davis* stated that, "Only [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay . . . ." (*Davis, supra*, 547 U.S. at p. 821 [126 S.Ct. at p. 2273].) Defendant acknowledges in his brief that, "*Crawford's* ruling is limited to 'testimonial hearsay.' "

In making that determination, the Supreme Court held that, "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822 [126 S.Ct. at pp. 2273–2274].) Interrogations "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" are clearly testimonial, "whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer." (*Id.* at p. 826 [126 S.Ct. at p. 2276.) Interrogation during a 911 call is not testimonial because it is not designed primarily to establish or prove some past fact but to describe current circumstances requiring police assistance.[7] The victim in *Davis* was facing an ongoing emergency and called 911 for help. She was speaking of events as they were occurring, rather than describing past events. The questions asked and answers given, viewed objectively, were necessary to enable resolution of the present emergency, rather than to learn what occurred in the past. Also, the level of formality in *Davis*, where in a nontranquil environment frantic answers were provided, was significantly lower than in *Crawford*, which involved an interview at the police station hours after the crime. (*Id.* at pp. 827–828 [126 S.Ct. at pp. 2276–2277].) *Davis* stated: "We conclude from all this that the circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony' . . . ." (*Id.* at p. 828 [126 S.Ct. at p. 2277].)

## C. *The trial court abused its discretion*

■ A ruling resting on a demonstrable error of law constitutes an abuse of discretion. (*People v. Jennings* (2005) 128 Cal.App.4th 42, 49 [26 Cal.Rptr.3d 709].) The trial court here abused its discretion by excluding the two videotaped interviews. It relied upon the language in *Crawford* that police interrogations are testimonial, from which it erroneously extrapolated that any statement to a police officer is testimonial and subject to the confrontation clause, a conclusion rejected in *Davis*. It also failed to consider that nonhearsay statements are not testimonial and therefore not subject to the confrontation clause. Further, the trial court erroneously relied on *People v. Pirwani* (2004) 119 Cal.4th 770 [14 Cal.Rptr.3d 673], which only held that the statutory hearsay exception for videotaped statements by victims of elder

---

[7] While not designed to establish or prove some fact in a subsequent prosecution, information generated in a 911 call may in fact aid a subsequent prosecution.

abuse, in Evidence Code section 1380, was unconstitutional. It did not consider whether such statements might be admissible for reasons apart from that code section.

### D. *The February interview*

█ We conclude that the February interview was not primarily testimonial and therefore not subject to the confrontation clause.[8] Whether an individual is acting as a witness and in essence "testifying" so as to require confrontation is determined by the surrounding circumstances including, (1) when the statements were made (proximity to the events), (2) the nature of the report given, (3) the level of formality when the statements were made, and (4) the purpose of obtaining the statements. (See *Davis, supra,* 547 U.S. at pp. 826–830 [126 S.Ct. at pp. 2276–2278].)

The February interview bore significant similarities to the scenario presented in *Davis.* The circumstances of the interview objectively indicate that its primary purpose was to assess Nelson's mental and physical condition and deal with her potentially critical need for assistance and protection. Nelson believed that the team was there to provide her with assistance, stating, "I think it's wonderful that there are people like you that, if I needed somebody, could really have help." Detective Percy described that the purpose of the visit was "to make sure no one's taking advantage of you." It was not primarily to establish a past crime by defendant. While the emergency presented was not as stark or temporally discrete as the domestic violence incident in *Davis,* it was no less real. Nelson was 92 years old, could not drive, was in failing physical and mental health, and did not know who her doctor was and what medication she was taking.[9] Her ability to provide for her basic needs and the adequacy and propriety of the care defendant was providing were in question. There was concern that an offense may have been occurring at that time. Further, there is no indication in the record that this visit was inspired by anything different than that which inspired the prior visits by police detectives in response to anonymous reports that Nelson may have been a victim of elder abuse.[10] On each of those occasions, the detectives concluded that the reports were unfounded and that Nelson appeared capable of communicating and taking care of herself. The February interview was conducted in the informal surroundings of Nelson's home, defendant was not in custody, and it was unknown if a crime had occurred.

---

[8] This conclusion does not automatically render Nelson's interview statements admissible. It simply eliminates the confrontation clause objection to their admissibility.

[9] An empty bottle of blood pressure medication was found in Nelson's home.

[10] The trial court found these earlier visits to have been nontestimonial and therefore not subject to the confrontation clause.

Additionally, a team from Genesis and Adult Protective Services, including a social worker and nurse, participated with Detective Percy in the interview in order to assess Nelson's physical and mental condition, and need for assistance. The nurse and social worker, not Detective Percy, did most of the questioning, the majority of which pertained to Nelson's background, physical condition and mental state.[11] Nelson was asked basic factual questions to assess her mental capacity. She was given a mini-mental examination in which she was asked to perform some basic tasks, including remembering three words, doing basic mathematical calculations, and drawing the hands of a clock to reflect a specified time. The interview did not focus on establishing facts of a past crime but on evaluating Nelson's circumstances and condition. Nelson was not acting as a witness against defendant or as his accuser, as she only made positive comments about him.

While we conclude that the February interview was not testimonial, the Supreme Court cautioned that, "[A] conversation which begins as an interrogation to determine the need for emergency assistance [can] . . . 'evolve into testimonial statements,' [citation], once that purpose has been achieved." (*Davis, supra,* 547 U.S. at p. 828 [126 S.Ct. at p. 2277].) The February interview did evolve, in part, into testimonial questioning regarding Nelson's relationship with defendant, his involvement in her financial affairs, and her feelings towards him, aimed at implicating him for elder abuse. Because defendant had no opportunity to confront Nelson, admission of the responses to those types of questions is precluded by the confrontation clause. (547 U.S. at p. 828 [126 S.Ct. at p. 2277].)

Even if the February interview was testimonial, we would nonetheless conclude that substantial portions of that interview are not subject to the confrontation clause because they were not sought to be admitted for the truth of the matter asserted, but as evidence of Nelson's mental state. (*Crawford, supra,* 541 U.S. at p. 59, fn. 9 ["The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"]; see also *People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1224 [32 Cal.Rptr.3d 613] ["Because the vast majority of the tape was not offered to establish the truth of the matter asserted, much of the tape is not hearsay at all. As nonhearsay, and therefore nontestimonial evidence, a great portion of the police dispatch tape is not subject to the analysis in *Crawford*"].) Nelson's responses to questions asked as part of her mini-mental evaluation during the February interview and by Dr. Evans in October 2003 were not offered for the truth of the matter asserted, but to

---

[11] Of the 64 pages of the transcript of the February interview, 44 pages included questioning solely by the social worker and nurse who were present, another 11 pages had questioning by them as well as by Detective Percy, and only 9 pages had questioning exclusively by the detective.

demonstrate her mental functioning. For example, her response to the question of how much seven from 100 is was not for the truth of that answer but to assess her mental functioning. Her response that she lived in Belmont Shores, when, in fact, she lived in Monrovia, was again to assess her memory and mental condition. Her numerous responses that she did not recall basic information, such as the number to call in case of a fire or her Social Security number, were circumstantial evidence of her mental state.

### E.   *The June interview*

Unlike the February interview, the June interview was testimonial, its primary purpose appearing to be the gathering of information to prosecute defendant. On March 27, 2003, after the February interview and before the June interview, a court-appointed caretaker for Nelson replaced defendant, thereby ensuring that Nelson received proper and adequate care. As a result, by the time of the June interview, there was no exigent need to assess Nelson's welfare. There was no continuing offense that needed to be immediately eradicated because defendant was no longer involved in Nelson's care. Detective Percy interviewed Nelson without the assistance of a social service representative. A substantial portion of the questioning pertained to defendant's conduct, Nelson's deteriorating opinion of him, and her desire that he not inherit any of her property.

As set forth in part I.D., *ante*, though the June interview was testimonial, those statements by Nelson that were not offered for the truth of the matter asserted were not precluded by the confrontation clause. (*Crawford, supra*, 541 U.S. at p. 59, fn. 9; *People v. Mitchell, supra*, 131 Cal.App.4th at p. 1224.) For example, Nelson's responses that demonstrated a lack of memory or comprehension are not hearsay offered to show her mental condition.

### F.   *Remand*

On remand, the trial court must determine, consistent with the views expressed herein, which statements in the two videotaped interviews are not testimonial hearsay. Those statements are not subject to the requirements of the confrontation clause. We caution, however, that simply because statements are not subject to the confrontation clause does not automatically

entitle them to admission in evidence. They are still subject to any other appropriate evidentiary objections, and the trial court retains its discretion to regulate admission under Evidence Code section 352. (Further, we do not decide the propriety of admitting a redacted videotape of the admissible portions of the interviews, as opposed to admitting a redacted transcript.)

## II.  *Videotaped tour of residence*

The People contend that the trial court erred in excluding that portion of the February 26, 2003, videotape depicting the condition of Nelson's residence, arguing that it is simply demonstrative, nontestimonial evidence "because there is no statement of a witness . . . [and] [b]ecause a defendant cannot possibly cross-examine photographic evidence at all. . . ." We agree.

■ Evidence is defined as "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Photographs and videotapes are demonstrative evidence, depicting what the camera sees. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 385–386 [63 Cal.Rptr.2d 1, 935 P.2d 708]; see also *People v. Carter* (1957) 48 Cal.2d 737, 751 [312 P.2d 665].) They are not testimonial and they are not hearsay, that is, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. . . ." (Evid. Code, § 1200.) Thus, the confrontation clause does not preclude the admission of the portion of the February 2003 videotape depicting the condition of Nelson's residence.[12]

## III.  *Expert testimony*

The People contend that the trial court erred in precluding the testimony of its expert on the ground that her opinions were based in part on the testimonial interviews of Nelson. The People argue that an expert may rely upon hearsay or other inadmissible evidence in forming the expert's opinion. This contention has merit.

■ It is the long-standing rule in California that experts may rely upon and testify to the sources on which they base their opinions (Evid. Code, §§ 801, 802), including hearsay of a type reasonably relied upon by professionals in the field. (Evid. Code, § 801, subd. (b); *Korsak v. Atlas Hotels, Inc.*

---

[12] Again, we do not decide the admissibility of this portion of the February 2003 videotape as against any other evidentiary objections that might be made.

(1992) 2 Cal.App.4th 1516, 1523–1524 [3 Cal.Rptr.2d 833]; see also *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) These rules apply to mental health experts. (*People v. Campos* (1995) 32 Cal.App.4th 304, 307–308 [38 Cal.Rptr.2d 113].) Hearsay relied upon by experts in formulating their opinions is not testimonial because it is not offered for the truth of the facts stated but merely as the basis for the expert's opinion. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210 [30 Cal.Rptr.3d 582]; see also *People v. Fulcher* (2006) 136 Cal.App.4th 41, 56–57 [38 Cal.Rptr.3d 702].)

■ *Crawford* was concerned with the substantive use of hearsay evidence that was admitted within an exception to the hearsay rule. It did not suggest that the confrontation clause was implicated by admission of hearsay for nonhearsay purposes. In fact, *Crawford* expressly stated that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra*, 541 U.S. at p. 59, fn. 9.) "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions." (*People v. Thomas, supra*, 130 Cal.App.4th at p. 1210.) The reason is clear; if hearsay is admitted for a nonhearsay purpose, it does not turn upon the credibility of the hearsay declarant, making cross-examination of that person less important. The hearsay relied upon by an expert in forming his or her opinion is "examined to assess the weight of the expert's opinion," not the validity of their contents. (*Ibid.*)

■ To the extent Dr. Evans's opinion regarding Nelson's mental competence was based on the videotaped interviews, the confrontation clause does not prevent her from rendering her opinion and stating the sources of information on which she relied in reaching it. Such evidence is not admitted for the truth of the matter asserted. (See *People v. Thomas, supra*, 130 Cal.App.4th at p. 1210.) This is not to say that the prosecution has an unbridled right to elicit testimony about every detail of those videotapes through the examination of its expert. The trial court has considerable authority and discretion to prevent the wholesale admission of incompetent hearsay, such as by resort to its discretion provided in Evidence Code section 352 and by its use of instructions to the jury. (*People v. Price* (1991) 1 Cal.4th 324, 416 [3 Cal.Rptr.2d 106, 821 P.2d 610] [expert cannot bring before jury incompetent hearsay under the guise of stating reasons for opinion]; *People v. Carpenter, supra*, 15 Cal.4th at p. 403.)

## DISPOSITION

The order appealed from is reversed and the matter is remanded for reevaluation of the admissibility of the proffered evidence.

Doi Todd, Acting P. J., and Ashmann-Gerst, J., concurred.