Filed 12/4/14  P. v. Fuentes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO FUENTES,<br><br>Defendant and Appellant. | F065567<br><br>(Fresno Super. Ct. No. F10900614)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

This case concerns a gang-related drive-by shooting that left one man dead and another wounded. Defendant was convicted as the shooter and now raises several claims on appeal.

First, he contends that the court improperly admitted hearsay evidence regarding descriptions of a man who visited a house near where the shooting would eventually take place. Defendant also asserts the court improperly declined to instruct on perfect and imperfect self-defense. "In light of the substantial evidence pointing to defendant's guilt" (*People v. Noguera* (1992) 4 Cal.4th 599, 623), including two eyewitness identifications made to police, we conclude that no prejudicial error occurred.

Defendant also claims the court erred in imposing a parole revocation restitution fine. We conclude that fine was required by Penal Code section 1202.45[1] because defendant's determinate term of 78 years and four months in prison "carried with it … a suspended parole revocation restitution fine." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*).) As a result, we find no error.[2]

Finally, defendant contends, and respondent concedes, that the trial court improperly enhanced the murder conviction pursuant to section 186.22, subdivision (b)(1). We accept respondent's concession. (See *People v. Lopez* (2005) 34 Cal.4th 1002, 1007.)

We will order the section 186.22, subdivision (b)(1) enhancement stricken and affirm the judgment as modified.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] We do note that defendant "is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

# STATEMENT OF THE CASE

Defendant was charged with the murder of Christopher Rodriguez[3] (count I – § 187); the attempted murders (§§ 664, 187) of Jesse Aispuro[4] (count II), Pablo Rodriguez (count III), Carlos Rodriguez (count IV), Andrew Zavala (count V), and Shane Bernal (count VI); shooting an inhabited dwelling (count VII - § 246); shooting from a motor vehicle (count VIII - § 12034, subd. (c)); and actively participating in a criminal street gang (count IX - § 186.22, subd. (a).)

The information also alleged that counts I though VIII were committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) As to the murder charge, the information alleged defendant intentionally killed Christopher while an active participant in a criminal street gang (§ 190.2, subd. (a)(22)), that the murder was intentional and perpetrated by discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)), and that a principal personally and intentionally discharged a firearm proximately causing Christopher's death. (§ 12022.53, subds. (d) & (e)(1).) As to count II, the information alleged that a principal discharged a firearm, causing great bodily injury to Jesse Aispuro. (§ 12022.53, subds. (d) & (e)(1).) As to counts III through VI, the information alleged that a principal intentionally discharged a firearm. (§ 12022.53, subds. (b) & (e)(1).)

A jury convicted defendant on all counts and found all allegations true. The court sentenced defendant to life without the possibility of parole (LWOP), plus 65 years to life, plus 78 years and four months. The sentence was comprised of: LWOP on count I, plus 25 years to life on the weapons enhancement (§ 12022.53, subd. (d)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)); nine years on count II, plus 25 years to life for the

---

[3] Since Christopher Rodriguez had two brothers with the same last name involved in this case, we will refer to each of them by their first name.

[4] The information spells Jesse's name: "Jessie." However, the bulk of the record contains the spelling, "Jesse." We will use the latter rendition.

weapons enhancement (§ 12022.53, subd. (d)), plus 10 years for the gang enhancement (§ 186.22, subd. (b); 12 years and four months on each of counts III through VI; and 15 years to life on count VII. Sentence on counts VIII and IX was stayed pursuant to section 654.

## TRIAL EVIDENCE

### The Shooting

A group of friends were "hanging out" near an apartment complex in Fresno on January 28, 2010. Several of the friends were Bulldog gang members, and the area was known as Bulldog gang territory. Among those present were Bulldog gang members Andrew Zavala, Jesse Aispuro, and brothers Carlos and Christopher Rodriguez. Shane Bernal and a third Rodriguez brother – Pablo Rodriguez – were also present.[5]

As the group was "hanging out," a silver Pontiac Grand Am drove up to a nearby house. A 23-year-old woman named Diana lived there with her mother and siblings. Two men exited the vehicle, visited with people there, and left in less than 30 minutes. Then, the two men got into the car, looked at the group of Bulldogs, and took off towards a nearby school. The car stopped and the front passenger exited. The passenger said, "[C]ome here, come here" to the group of Bulldogs, then the car, with the passenger, drove away.

Half of the Bulldog group went to a store to get chips. As they were returning from the store, the group again saw the same car driving slowly past them. The car made a U-turn. The car's passenger then stuck half his body out of the window and began shooting at the group. Zavala and Pablo sought cover. They emerged to find that Christopher and Aispuro had been shot. Aispuro was shot in the leg and Christopher Rodriguez had been fatally wounded. Several bullets also penetrated a nearby residence.

---

[5] Pablo expressly denied being a member of any gang at trial.

4.

**Police Investigation**

*The Scene*

Several bullets had penetrated the exterior of a residence at 617 N. Jackson, near where Christopher's body was found. Police also located expended nine-millimeter casings in the road.

Two live .38-caliber bullets were found under Christopher's body. A .38-caliber revolver was found in the "back area" of an abandoned house next door. The revolver had two expended casings inside. There was a trail of blood inside the abandoned house that led to the backyard.

There was no reliable way to determine whether the .38-caliber revolver had been fired recently.

*Diane Gonzalez*

Diane Gonzalez had left her house around 6:00 p.m., before the shooting had taken place. Early on the morning after the shooting, detectives found Gonzalez at her boyfriend's house and interviewed her. They asked her who had come to her home the night of the shooting. Gonzalez told the detective she did not know because she was not at home.

After the police interview, Gonzalez asked her family members who had come by the house on the night of the shooting. They told her "who they thought had come by." Based on the family members' descriptions, Gonzalez believed the person was defendant.

The next day, Gonzalez called detectives and told them she had been assaulted. Two girls were outside of her house "making signs and threats." At some point, they "jumped" her and Gonzalez "got hit." Detectives came to Gonzalez's house and spoke with her. Gonzalez told a detective that she "believed" the man who had come to her house the night of the shooting was "Alfredo" also known as "Clever." Gonzalez had known defendant from "back when" she "used to hang out in Sanger."

*Photographs*

Detectives obtained a photograph of defendant and his brothers,[6] and showed them to Gonzalez. In the photographs, Gonzalez identified defendant as the person she believed had come to her home the night of the shooting.

Then, detectives created a photographic lineup, which included defendant's photographs along with five other photographs of similar looking individuals. From the lineup, Pablo and Zavala each separately identified defendant as the shooter.[7] Pablo reaffirmed his identification at trial, testifying that he was "more than 100 percent sure" defendant was the shooter. Zavala, however, testified that he did not "remember" defendant "being the guy."

*The Vehicle*

Zavala and Pablo both described the shooter's car as a four-door Pontiac Grand Am. Detectives retrieved footage from a video policing camera at an intersection near where the shooting occurred. The footage showed a car matching the description driving through the intersection at 9:32 p.m., five minutes before police were dispatched to the scene.

The police arrested defendant at his apartment. A silver Pontiac Grand Am was located outside.

**Defense Case**

The defense called a single witness: Officer Andrew Jaramillo. Jaramillo spoke to Zavala on the night of the shooting. Zavala told Jaramillo that he had a quick glance of the passenger, who looked to be a bald Hispanic male.

---

[6] Defendant's brothers also went by some variation of the monicker, "Clever," so detectives included their images.

[7] Zavala said, "Damn, that's him," when he saw defendant's photograph.

Defense counsel's opening and closing arguments were not transcribed. However, defense counsel's questioning of various witnesses suggests that insufficient proof of the shooter's identity was a primary defense theory presented to the jury.

## DISCUSSION

### I.

### ADMITTING TESTIMONY REGARDING THE DESCRIPTIONS AND IDENTIFICATION OF THE VISITOR TO GONZALEZ'S HOUSE WAS NOT PREJUDICIAL ERROR

Defendant argues that testimony regarding who had come to Gonzalez's house before the shooting was inadmissible hearsay. He cites to (1) Gonzalez's mother's testimony that someone described the visitor to her and that she conveyed the description to Gonzalez; (2) Gonzalez's testimony regarding what her family members told her about one of the two men who had visited her house the night of the shooting; and (3) Gonzalez's testimony that she told detectives one of the visitors was "probably Clever."

"Hearsay is evidence of an out-of-court statement offered to prove the truth of its contents." (*People v. Nelson* (2012) 209 Cal.App.4th 698, 707.) Such evidence is inadmissible unless it comes within an exception to the hearsay rule. (*Ibid.*)

The Attorney General argues that the challenged testimony was not offered for its truth, but instead was offered "to explain the development of the investigation."[8] Ultimately,

---

[8] We are skeptical of the Attorney General's position. Arguably, the primary value in the challenged testimony is its implication of defendant as one of the men who visited Diana's house and subsequently fired at the victims.

The Attorney General cites to *People v. Mitchell* (2005) 131 Cal.App.4th 1210 (*Mitchell*). In *Mitchell*, the defendant robbed a restaurant, carjacked a vehicle and led police on a pursuit in the stolen vehicle. (*Id.* at p. 1214.) A recording of the police dispatch was admitted at trial. (*Ibid.*) On the tape, officers were heard calling out their locations and their directions of travel. (*Ibid.*) The *Mitchell* court rejected the defendant's claim that the tape was erroneously admitted. The court held that much of the recording was not hearsay at all because it was offered "to show how the pursuit unfolded and to describe the police officers' actions." (*Id.* at p. 1224.) Importantly, the court held that the truth of the matters asserted on the tape were "immaterial to any contested matter in the trial." (*Ibid.*) The same cannot be

we need not determine whether the contested testimony constituted hearsay because we conclude its admission was harmless.

Erroneous admission of hearsay evidence can be rendered harmless in light of substantial evidence pointing to defendant's guilt. (See, e.g., *People v. Noguera*, *supra*, 4 Cal.4th at p. 623.)

The testimony defendant challenges concerned the description and identity of the visitor to Gonzalez's house the night of the shooting. This was circumstantial evidence of guilt that depended on several additional inferences for its probative value.[9]

In contrast, the most compelling evidence of defendant's guilt were the two eyewitness identifications made to police shortly after the shooting.[10] The strength and admissibility of this direct and damning evidence is not dependent on the admissibility of the testimony regarding the visitor to Gonzalez's house.

It is true that Gonzalez's interview led to police obtaining the two eyewitness identifications. But that causal relationship does not help defendant's argument. Even if the *reason* police obtained strong evidence of guilt is undermined, the strength of the later-obtained evidence may be unaffected. We have explained a similar concept on several occasions with the following hypothetical:

> " 'Suppose … that a surveillance camera captures [a] robbery on tape. Police use facial recognition software to check the robber's facial features against driver's license photographs. When the computer indicates a match with "Joey," officers obtain his name and address from DMV records, then go to his house and interview him. In the course of the interview, "Joey" confesses.

said of the present case. The identity of the man who visited Diana's house before the shooting *was* relevant to the contested issues at defendant's trial.

[9] The relevance of the challenged testimony depended on the inference that (1) one of the two men who visited Gonzalez's house was the shooter, and (2) that of the two men who visited Gonzalez's house, the man whose description matched defendant was the shooter.

[10] In addition, a vehicle matching the description provided by eyewitnesses was found outside defendant's apartment when he was arrested.

Whether facial recognition software is discerning and accurate enough to select the perpetrator, or whether it declared a match involving many different people who resembled "Joey," or how many driver's license photographs were searched by the software, is immaterial: what matters is the subsequent confirmatory investigation.' " (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1275–1276.)

Gonzalez's interview focused the police investigation ultimately leading to strong evidence of defendant's guilt. Even if this initial evidence that focused the investigation is removed from consideration, the strength of the later obtained evidence remains sufficient to render any error harmless.

Because there is significant evidence of defendant's guilt, we find no prejudicial error.

## II.

## THE COURT DID NOT PREJUDICIALLY ERR IN DECLINING TO INSTRUCT ON PERFECT AND IMPERFECT SELF-DEFENSE

Defendant contends the court prejudicially erred in declining to instruct the jury on perfect and imperfect self-defense. We disagree.

A trial court must instruct the jury on all lesser included offenses supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) To trigger this duty to instruct, there must be evidence that defendant committed the lesser offense but not the greater offense. (*Ibid*.) The evidence must be substantial enough that "a reasonable jury could find [it] persuasive. [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) No instruction is required when there is no supporting evidence or when the evidence is " 'minimal and insubstantial.' [Citation.]" (*Id.* at p. 201.) Similarly, when there is no substantial evidence to support a defense, the trial court may refuse the requested instruction. (See *People v. Miceli* (2002) 104 Cal.App.4th 256, 268.)

Erroneous failure to instruct on perfect and imperfect self-defense may be deemed harmless. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086-1087 [imperfect self-defense]; *People v. Saavedra* (2007) 156 Cal.App.4th 561, 569 [perfect self-defense].)

Defendant contends there was substantial evidence of perfect and imperfect self-defense. He points primarily to evidence that a .38-caliber revolver and multiple .38-caliber bullets were found near the crime scene.[11] Defendant submits this evidence showed the Bulldogs were the initial aggressors.

Even if this evidence raises some question as to whether some form of self-defense instruction was warranted, we are convinced that any error was harmless. Zavala and Pablo testified that no one in their group had a gun. There was no evidence that showed any of the Bulldogs had brandished, pointed or fired the .38-caliber revolver at anyone before defendant committed the conduct underlying his charges. Nor was any evidence introduced to show that defendant was actually in fear at any point in time. Without such evidence, we are convinced the jury would not have found an instruction on perfect or imperfect self-defense applicable. As a result, we conclude the lack of instruction on perfect or imperfect self-defense was not prejudicial error.

### III.

### THE COURT ERRED IN ENHANCING COUNT I PURSUANT TO SECTION 726.22, SUBDIVISION (B)(1)

Defendant contends, and respondent concedes, that the court improperly enhanced count I pursuant to section 186.22, subdivision (b)(1). We agree. (See *People v. Lopez*, *supra*, 34 Cal.4th at p. 1007.) As a result, we will strike the section 186.22, subdivision (b)(1) enhancement.

---

[11] Defendant also references evidence that Zavala told police that a beer bottle was thrown at the shooter's vehicle. Zavala recanted this account at trial, testifying that he did not remember if anyone threw anything at the vehicle. Even under Zavala's initial account, the beer bottle was thrown before the vehicle left the first time. The fact that the eventual shooter returned to the scene after the beer bottle was allegedly thrown strongly undermines the notion that he was in fear of imminent harm.

# IV.

## THE COURT DID NOT ERR IN IMPOSING A PAROLE REVOCATION FINE

Defendant contends the court erred in imposing a parole revocation fine.  We disagree.

A parole revocation fine is required in "every case where a person is convicted of a crime and his or her sentence includes a period of parole."  (§ 1202.45.)  Defendant contends the fine does not apply because he was sentenced to life imprisonment *without* the possibility of parole on the murder conviction.

In *Brasure*, *supra*, 42 Cal.4th 1037, the defendant was sentenced to death and a determinate term of imprisonment.  (*Id.* at p. 1075.)  The determinate term included a period of parole.  (*Ibid.*; see § 3000, subd. (a)(1).)  Thus, *Brasure* was a "case where a person is convicted of a crime and his or her sentence include[d] a period of parole .…"  (§ 1202.45, subd. (a); *Brasure*, *supra*, 42 Cal.4th at p. 1075.)  And, the determinate term "carried with it … a suspended parole revocation restitution fine."  (*Brasure, supra*, at p. 1075.)  This result obtained even though the defendant was also sentenced to an indeterminate term that did not include a period of parole (i.e., death).  (See *ibid*.)  The fine was applicable even though the defendant was "unlikely ever to serve any part of the parole period on his determinate sentence."  (*Ibid*.)

Here, as in *Brasure*, defendant was sentenced on several charges.  On the murder conviction, defendant was sentenced to life without possibility of parole.  It is a tautology to note that this sentence did not include a period of parole.  As a result, the LWOP sentence did not carry with it a parole revocation restitution fine.  (See § 1202.45.)

However, in addition to LWOP, defendant received a determinate sentence of 78 years and four months.  This determinate sentence *does* necessarily include a period of parole.  (See § 3000, subd. (a)(1).)  As a result, the determinate sentence "carried with it … a suspended

parole revocation restitution fine." (*Brasure*, *supra*, 42 Cal.4th at p. 1075. See also § 1202.45.)[12]

## DISPOSITION

The section 186.22, subdivision (b)(1) enhancement on count I must be stricken. The matter is remanded to the trial court to amend the abstract of judgment accordingly and to transmit certified copies of the amended abstract to all appropriate parties and entities. As modified, the judgment is affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:

_____
Franson, J.

_____

[12] Cases like *People v. Oganesyan* (1999) 70 Cal.App.4th 1178 are "distinguishable as involving no determinate term of imprisonment .…" (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

However, defendant cites to one case that is apparently not distinguishable on this basis: *People v. McWhorter* (2009) 47 Cal.4th 318 (*McWhorter*). In *McWhorter*, the defendant was convicted of first degree residential robbery and two first degree murders. (*Ibid*.) He was sentenced to death (*ibid.*) and presumably also received a determinate sentence on the first degree residential robbery conviction. The trial court also imposed a parole revocation restitution fine. (*Ibid.*; *id.* at p. 380.) On appeal, the Attorney General conceded that the fine should be stricken. The Supreme Court accepted the concession and ordered the fine stricken. (*Id.* at p. 380.) The court's consideration of the issue spanned four sentences.

The *McWhorter* court's unadorned conclusion seems to conflict with the reasoning of *Brasure*. While *Brasure* contains analysis and a cogent rule of law, *McWhorter* simply accepts a concession on the issue with little analysis. Since both decisions are from our Supreme Court, we choose to follow the reasoned decision of *Brasure* over the four sentences in *McWhorter* that are virtually devoid of reasoning. (Cf. *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 358 ["When, as here, a decision treats an issue in a 'summary and conclusory' manner, and is 'virtually devoid of reasoning,' its authoritative status is undermined"].)

12.

_____
Peña, J.