Filed 3/20/25  In re S.F. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re S.F., a Person Coming Under the Juvenile Court Law. | C099783 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.F.,<br><br>Defendant and Appellant. | (Super. Ct. No. 22DQ00208) |

Minor S.F. shot into a crowded house, hitting five people.  On the prosecutor's petition, the juvenile court held a transfer hearing under Welfare and Institutions Code[1] section 707.  After the hearing, the juvenile court found by clear and convincing evidence

---

[1]     Further undesignated section references are to the Welfare and Institutions Code.

1

minor was not amenable to rehabilitation while under the jurisdiction of the juvenile court and ordered minor transferred to criminal court. Minor appeals, challenging the juvenile court's analysis under former section 707 and in light of recent amendments to section 707 made by Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545). Minor also raises multiple issues related to the testimony of two experts. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Petition And Circumstances Of The Allegations*

A petition under section 602 was filed alleging minor committed six crimes in Chico on September 3, 2022, when he was 16 years old: five counts of assault with a semiautomatic firearm and one count of discharge of a firearm at an inhabited dwelling, with firearm and great bodily injury enhancements alleged for all counts. In the petition, the prosecution requested a hearing to determine whether minor should be transferred to criminal court under section 707.

The juvenile court held a transfer hearing over eight days in July, August, September, and October 2023. At the hearing, a video was played showing two synced camera angles from outside and inside a house during a party in Chico after 1:00 a.m. on September 3, 2022. The video shows an argument at the front door with someone later identified as minor. After the argument, minor walked into the party, came back outside, and began to walk down the front steps of the porch. Minor then stopped, turned around, walked back up the stairs, pulled out a gun, pointed it through a crowd of people on the porch, and fired several rounds through the front door into the house, pulling the trigger multiple times after all the ammunition had been fired. Minor then ran away. Witnesses testified the argument depicted in the video was because minor's acquaintances were not allowed to enter the party. Witnesses also testified that, sometime before minor shot his firearm, he said, " 'I'm going to blow this bitch up,' " or he was "going to light the place

2

up." Minor was arrested shortly after the incident with his hair cut shorter than it had been during the incident.

Minor's bullets struck five people inside the house and four testified to their injuries at the hearing. One victim testified he was paralyzed from the waist down and could no longer perform basic life functions without help.

In the juvenile court transfer report[2] prepared before the hearing, minor told the probation officer he lived with his biological father after meeting him for the first time when minor was 12 years old. Minor said his father was a " 'general in the 20 Bloods' gang" and "encouraged [minor] to assist him in a [cannabis] robbery at the age of thirteen."

## II

### *Amenability Testimony*

Detective Jack Ditty testified at the hearing he had been a sworn police officer for over 10 years and had for the prior three years been a City of Chico police officer assigned to the violence suppression unit, which deals with gang-related crimes. Detective Ditty testified to the gang training he received, including while in the police academy and most recently an "ICI [c]ore [g]ang [t]raining," which was "a 40-hour gang course." After the defense cross-examined him on his qualifications, the juvenile court designated Detective Ditty as "an expert in the area of criminal street gangs within Butte County, in particular[] the Crip criminal street gang as it applies to the locality of Chico."

For this case, Detective Ditty interviewed witnesses, reviewed bodycam footage, reviewed interviews of minor, and researched social media. Based on this information, Detective Ditty concluded minor was a member of the Crips criminal street gang. Specifically, Detective Ditty pointed to a bodycam video, which was played at the

---

[2]     The juvenile court and the parties refer to this report as the probation report. For consistency, so shall we.

hearing, from one incident in October 2020 when minor was detained after being reported for trespassing on school property. Detective Ditty testified minor was defiant towards officers, calling one "bitch"; used the word "cuz," which the "Crip gang" uses "as a slang word talking to each other"; and wore a "royal blue, hooded sweatshirt," the "same color that the Crips wear." Detective Ditty testified about another bodycam video, which was also played at the hearing, from May 2022 outside of a hospital after "some sort of confrontation between two rival gangs." On that video minor can be heard claiming "to be a Crip" and mentioning a rival gang named the Norteños. Detective Ditty also reviewed a police report describing minor's arrest for public intoxication and "his behavior [as] threatening to the point where [officers] had to keep him in handcuffs." Detective Ditty also testified about the video from the shooting and noticed minor displayed "some gang sign" to someone inside the party wearing red, which could have been "a threatening gesture" if that person was an opposing gang member.

The prosecutor also called psychologist Dr. Anthony Urquiza who had over 10 years of experience performing evaluations of minors in juvenile hall. The juvenile court recognized him as an expert in the areas of child development, psychopathology, delinquency, and mental health treatment and rehabilitation. Dr. Urquiza reviewed Detective Ditty's report, the probation report, minor's high school records, minor's behavioral report from juvenile hall, and the defense's transfer hearing brief, which included Dr. Amir Ramezani's report. Based on this review, Dr. Urquiza testified that minor "has a long history, getting close to two decades' worth of history, at minimum a decade and a half, of aggression, defiance, noncompliance, things that have been problematic in his life. And being in a classroom where somebody is going to tell him -- teach him about having a better attitude, about sort of being more patient, that is not going to have an effect on his behavior." Assuming minor had eight years in the juvenile court's jurisdiction, Dr. Urquiza believed it "would certainly be possible [for minor to change] . . . . But it would be incredibly difficult to do."

4

Dr. Urquiza also analyzed each criterion under section 707 and found they all weighed in favor of transferring minor to criminal court except for the criterion considering previous juvenile court attempts to rehabilitate minor. Dr. Urquiza consequently testified his ultimate opinion was that minor should be "transfer[red] to the adult system" because "it would be very difficult to successfully rehabilitate" minor while in the juvenile court's jurisdiction. On cross-examination, Dr. Urquiza conceded he had not interviewed minor nor talked with anybody in his family.

Minor's counsel called Dr. Ramezani to testify, whom the juvenile court designated as an expert in neuropsychology. Dr. Ramezani conducted a neuropsychology evaluation of minor and found minor "has severely compromised executive functioning relative to decision-making and reasoning," including diagnoses for "mild neurocognitive disorder," "posttraumatic stress" disorder, "depressive disorder," "an anxiety disorder," and "multiple substance use diagnoses that were in remission, because [minor] was in a controlled environment." Dr. Ramezani believed "with appropriate rehabilitation, [minor] can make some significant improvement in his thinking abilities, his cognitive functions." Dr. Ramezani also commented on all of the criteria under section 707 and testified only one favored transferring minor to criminal court in his opinion, the gravity of the alleged offense. Based on this, Dr. Ramezani testified it was his overall opinion minor can be "rehabilitated within the timeline of the juvenile [court's] jurisdiction."

Dr. Urquiza also commented on Dr. Ramezani's analysis during his testimony, noting he is familiar with the neuropsychology tests Dr. Ramezani used because Dr. Urquiza has used them in the past to inform treatment plans. But Dr. Urquiza does not personally administer the tests because he is "not a neuropsychologist." Some of the results from Dr. Ramezani's neuropsychology evaluation confirmed Dr. Urquiza's opinions. For example, the evaluation showed an "extremely high combination of drug and alcohol scales" for minor, and "those are really hard to treat, that combination of drugs and alcohol and trauma symptoms."

5

Minor called several witnesses who testified to his behavior in juvenile hall. This included a teacher at juvenile hall who testified minor "wanted to learn immediately," and though he came in with very few credits, minor was now ready to graduate early from high school with a 3.4 grade point average and had no behavior issues. A teacher of an anger reflection replacement training said over the year she had known minor, she had "seen nothing but more improvements" on "maturity." And a "social impact consultant" testified as "an expert for the purpose of evaluation and rehabilitation of youthful and adult offenders." This expert testified it was his opinion minor "should be retained in juvenile court" because he thought minor "can be rehabilitated. [Minor] can have an opportunity to create really productive relationships and grow and mature into adulthood."

## III

### *Juvenile Court's Analysis*

After closing arguments, the juvenile court took the matter under submission and then announced its decision two weeks later on October 25, 2023. The court first stated the evidence it considered, which included notes from all testimony, the parties' briefs, all exhibits, and the probation report. The juvenile court also determined the maximum jurisdiction of the court was until minor's 25th birthday, which was seven years five months and two days from that day. The juvenile court then went through each criterion under section 707 and found two weighed against transfer, ability for rehabilitation within the juvenile court's jurisdiction and previous attempts by the juvenile court to rehabilitate; two weighed in favor of transfer, criminal sophistication and gravity of the offense; and one weighed neutrally, delinquency history.

In analyzing the criteria collectively, the juvenile court noted the gravity of the offense criterion "cannot be the sole basis" for transferring, and instead, the "weight of no single criteri[on] can answer the question the [c]ourt must address." The juvenile court therefore "weighed all the criteria in the context of whether [minor] is amenable to

6

rehabilitation within the jurisdiction of the [c]ourt" and ultimately found "by clear and convincing evidence that [minor] is not amenable and order[ed] that the jurisdiction over [minor] be transferred to the criminal court." The court noted that "this was a very close case in light of the significant mental and emotional issues, childhood trauma, and negative familial influences that [minor] suffered. But the [c]ourt did weigh all of that evidence and exercise[d] its discretion to order transfer of jurisdiction."

Minor appeals.

## DISCUSSION

### I

### *No Reversible Error With The Juvenile Court's Section 707 Criteria Analysis*

Minor challenges the juvenile court's section 707 analysis, arguing "the treatment of the criteria and the rendering of this decision . . . went wrong, in multiple ways and for a variety of reasons." Minor specifically targets the juvenile court's analysis as to three of the criteria, and we will address each separately.

### A

### *Legal Standards*

Section 707 provides the only method for the prosecution to try a juvenile offender in criminal court. To transfer a minor under this section, the prosecution must show "by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).) The statute sets out five criteria that juvenile courts must consider in making this determination. These are "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and "[t]he

7

circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

The juvenile court does not consider these criteria in isolation. Instead, the statute "requires the juvenile court to consider all five [criteria] together in determining whether the minor is amenable to rehabilitation." (*In re E.P.* (2023) 89 Cal.App.5th 409, 417.) Nor does the statute dictate the importance of one criterion over another: "[T]he court has the discretion to conclude that one or more of the five [criteria] predominate so as to determine the result, even though some or all of the other [criteria] might point to a different result." (*Ibid.*)

Each of the five criteria in turn includes instructions for factors a court considers when evaluating that criterion. Following the conclusion of minor's transfer hearing in October 2023, the instructions following each criterion changed. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii); Stats. 2023, ch.716, § 1.) At the time of the hearing, they stated that "the juvenile court *may* give weight to any relevant factor" within each criterion. (Former § 707, subd. (a)(3)(A)(ii), italics added; accord, former § 707, subd. (a)(3)(B)(ii), (C)(ii), (D)(ii), (E)(ii); see Stats. 2023, ch.716, § 1.) Effective January 1, 2024, Senate Bill 545 amended the statute to change *may* to *shall*, thereby "mak[ing] consideration of any relevant factor mandatory." (Legis. Counsel's Dig., Sen. Bill 545 (2023-2024 Reg. Sess.) Stats. 2023, ch. 716; see *In re Miguel R.* (2024) 100 Cal.App.5th 152, 164-165 (*Miguel R.*).)

We review a juvenile court's decision whether to transfer a minor to criminal court for abuse of discretion. (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 680; *Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) Under this standard, "[t]he court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo." (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 187 (*Kevin P.*).) " '[I]ts application of the law to the facts is reversible only if arbitrary and capricious.' " (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 383.) "Because the juvenile court

8

must make [the transfer] finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, at p. 165.)

To the extent we are called on to interpret statutory text, " ' " ' "our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " [Citation.] "[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible." ' [Citations.] If the language of the statute is clear and unambiguous, there is no need for judicial construction and our task is at an end. If the language is reasonably susceptible of more than one meaning, however, we may examine extrinsic aids such as the apparent purpose of the statute, the legislative history, the canons of statutory construction, and public policy." (*Earnest v. Commission on Teacher Credentialing* (2023) 90 Cal.App.5th 62, 74.)

B

*The Juvenile Court's Criminal Sophistication Finding Was Not Erroneous*

Minor makes both a legal and substantial evidence challenge to the juvenile court finding the criminal sophistication criterion weighed in favor of transfer. First, minor contends the juvenile court "misinterpreted" the criterion because the court (1) "incorrectly viewed indicia of ordinary criminal behavior as evidence of sophistication," and (2) "it used evidence of normal intelligence to support a sophistication finding, despite a clear bar on such use." These errors also resulted in "a decision [that] was unsupported by substantial evidence." We disagree.

9

1

*Relevant Background*

For criminal sophistication, the juvenile court noted minor had "suffered significant negative influences throughout his youth," had a lack of "any family member to protect him or guide him in positive or prosocial thinking," and has been diagnosed with "mental and emotional health issues." But the court was "not persuaded that those factors compelled [minor] to commit the acts here." Instead, the court found minor "was not acting impetuously and fully appreciated the risks of his behavior, and acted with sophistication both in the commission of the offense and in his efforts to conceal that he was the offender." This was based on minor threatening to shoot into the party prior to the shooting, "[t]here were objectively no imminent threats to [minor] when [minor] turned to shoot," there was "substantial evidence [minor] was motivated by a gang mentality regardless of whether he was a bona fide member of a gang or simply idealized the lifestyle," "his readiness to shoot by being armed with a loaded firearm and an apparent knowledge and ability to use it," "[minor] modifi[ng] his appearance by cutting his hair in a much less distinctive style than he wore at the time of the shooting," and minor demonstrating "aptitude in his school work" while in juvenile hall reflecting "at least average intellectual capacity at the time of the shooting." Specifically on the evidence of gang involvement, the court noted "his father's negative role modeling as a gang member and drug dealer," but found minor's identification with the "Crips magnifies his criminal sophistication, as he appears to have personified the principles of respect and fearmongering perpetrated by the gang during this event as evidenced in other interactions with law enforcement prior to this event." Thus, the juvenile court was "persuaded by clear and convincing evidence that [minor] acted with elevated criminal sophistication," which "weighs in favor of transfer to the criminal court."

## 2

### *Legal Standards*

When evaluating the "degree of criminal sophistication exhibited by the minor" criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery."  (§ 707, subd. (a)(3)(A)(i)-(ii).)

"The criminal-sophistication criterion 'requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.' "  (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 192.)  Criminal sophistication can be shown with facts demonstrating an ' "ability to appreciate the risks and consequences of [one's] criminal behavior' and [one's] awareness 'of the wrongfulness . . . of [one's] conduct.' "  (*Id*. at p. 193.)  Positive factors such as "normal cognitive functioning" or intelligence by itself "do not affirmatively demonstrate criminal sophistication."  (*Ibid*.)  But they can support finding this criterion "weighs in favor of transfer to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication."  (*Ibid*.; see *In re J.S.* (2024) 105 Cal.App.5th 205, 214 ["There was little to no indication [the minor] suffered from any intellectual deficits.  While in custody, [the minor] was able to finish high school and had taken college level courses"].)

### 3

*Juvenile Court Did Not Commit Legal Error*

*By Applying The Criminal Sophistication Criterion*

Minor asserts for his first argument of legal error that the use of guns or associations with gangs indicates normal criminal behavior, as opposed to sophisticated criminal behavior. We reject this contention because it misunderstands the purpose of this criterion. The criminal sophistication criterion examines the minor's criminal sophistication as it relates to adult criminal behavior. The investigation is not into whether the minor is sophisticated as compared to adult criminals, but whether the minor is sophisticated as compared to other minors, such that the minor is not amenable to rehabilitation under juvenile jurisdiction. This is why the criterion examines factors such as "maturity" and whether the minor acted from "peer pressure." (§ 707, subd. (a)(3)(A)(ii).)

Whether a minor used a gun would certainly show criminal sophistication for section 707 purposes, as it is a much more effective and adult means of committing a crime. This is especially true within the context of retaliation for perceived slights where there are much more juvenile forms of retaliation for being denied admission to a party, such as throwing eggs at a house. So too with gangs. As the juvenile court found, notwithstanding the evidence of his father's influence, minor's interactions with law enforcement established a desire to personify gang principles. This was not the result of peer pressure, which is a factor mitigating against criminal sophistication. (§ 707, subd. (a)(3)(A)(ii).) The interactions with law enforcement supported finding minor made a willful and mature decision to associate with an adult gang, including flashing gang signs shortly before the shooting. We therefore conclude the juvenile court properly found evidence of minor's use of a gun and gang association supported this criterion.

Minor also argues the juvenile court improperly "weaponize[ed] . . . minor's intelligence against him." But the juvenile court did not use minor's normal intelligence

in isolation, as disapproved of in *Kevin P.* (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 193 ["We agree that such positive factors do not affirmatively demonstrate criminal sophistication"].) Instead, the juvenile court noted minor's "at least average intellectual capacity" after it had analyzed minor's use of a gun, gang participation, and other factors supporting the criminal sophistication criterion weighing in favor of transfer. We therefore understand the juvenile court was finding minor's intelligence did not mitigate those factors against transfer, an analysis approved of in *Kevin P.*: "Positive background factors may support a juvenile court's finding that this criterion weighs in favor of transfer to the extent they fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication. [T]he gang involvement of a minor with poor cognitive functioning might demonstrate a lesser degree of criminal sophistication than the gang involvement of a minor with normal cognitive functioning." (*Ibid.*) This is what the juvenile court did here, it therefore did not abuse its discretion by finding minor's intelligence did not mitigate minor's criminal sophistication.

4

*Substantial Evidence Supported The Juvenile*

*Court's Criminal Sophistication Finding*

Minor also argues the juvenile court finding the criminal sophistication criterion weighed in favor of transfer lacked substantial evidence. This is in part based on his argument the juvenile court could not rely on the evidence of "ordinary criminality," which we have already rejected. But minor makes additional arguments that the evidence the juvenile court relied on did not meet the clear and convincing evidence standard; we disagree.

For the reasons stated above, the evidence of minor's gun use and gang association support criminal sophistication. The juvenile court also relied on substantial evidence minor was acting without an imminent threat, not only had a gun but knew how to use it, and cut his hair to avoid detection. Dr. Urquiza, an expert in child development and

13

rehabilitation with over 10 years of experience evaluating youth in juvenile hall, also testified it was his opinion minor exhibited criminal sophistication weighing in favor of transfer. We conclude this constitutes " 'substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

## C

### *The Juvenile Court's Delinquent History Criterion Finding Was Not Erroneous*

Minor also makes both legal and substantial evidence challenges to the juvenile court finding minor's prior delinquent history criterion weighed neutrally. Here, minor argues the juvenile court (1) could not find this weighed neutrally because it was the prosecutor's burden to establish the criterion; (2) erred by "adopt[ing] a definition of 'delinquent history' [that] expansively included every misbehavior by [minor], at any age, in any context"; and (3) "improperly used [minor's] positive post-detention progress as a negative characteristic." Minor also contends the finding lacked substantial evidence. We disagree.

### 1

### *Relevant Background*

For the previous delinquent history criterion, the juvenile court noted minor "had no formal prior contact with the juvenile court. However, [minor's] school records demonstrate a persistent and troubling pattern of disrespectful, disruptive, and intentional behavior, especially from the point of the [sixth] grade forward, and often in the presence of substitute teachers." This included abusive and defiant language towards teachers and staff, and "[o]f great concern [were] separate incidents while [minor] was 11 years old. He stabbed another youth with a pencil. He bit another youth, causing her to require medical attention. He threatened to harm another youth. All separate events." The court noted minor "had little to no stability or encouragement to support his attendance in school," but found clear and convincing evidence minor had the opportunity to "modify

14

his behaviors and take advantage of educational opportunities by school staff consistently throughout his education," and his "capacity to be successful in the school environment is evidenced by his performance more recently" in juvenile hall. But ultimately, the juvenile court found minor's "prior delinquent history weighs neutrally as to transfer to the criminal court or retention with the juvenile court."

## 2

### *Legal Standards*

When evaluating the "minor's previous delinquent history" criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(i)-(ii).)

In *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 453, the appellate court found this criterion's statutory language is "ambiguous as to whether 'delinquent history' and 'delinquent behavior' refer to conduct resulting in a delinquency petition or to any delinquent conduct." But the court concluded: "[T]he legislative history of the section 707 criteria indicates an overarching intent to grant judges broad discretion to consider all evidence relevant to this inherently case-by-case determination. Narrowly construing the statutory language to prohibit the juvenile court from considering relevant information would be contrary to this legislative intent." (*Id*. at p. 455.) The *D.C.* court thus affirmed the juvenile court considering the minor's "behavior documented in his school records." (*Id*. at p. 456; see *In re J.S.*, *supra*, 105 Cal.App.5th at pp. 214-215 [transfer finding appropriate considering, among other things, the minor's " 'significant school delinquency' history starting in the seventh grade, including poor behavior, suspensions, and multiple attempts by school officials to rehabilitate [the minor]"].)

15

*Juvenile Court Did Not Commit Legal*

*Error In Applying The Delinquent History Criterion*

We first reject minor's contention a juvenile court cannot find a criterion weighs neutrally. Determining section 707 amenability is not a mathematical analysis where the juvenile court must decide based on how many of the criteria are or are not in favor of transfer. The analysis is holistic, permitting courts discretion to examine the relative weight of the criteria, not just the number of criteria, and if they weigh collectively in favor of transfer by clear and convincing evidence. (§ 707, subd. (a)(3); *Kevin P.*, *supra*, 57 Cal.App.5th at p. 186 [" 'The weight to be given [to] each of these factors is within the court's discretion' "].) And finding a criterion neutral is effectively finding it has no weight given the conflicting evidence. This is entirely reasonable within the context of the juvenile court's discretion. (Cf. *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1030, 1031 [finding the juvenile court did not specify whether several criteria "weighed in favor of transfer, against transfer, or was neutral"].)

We also decline minor's invitation to disagree with *D.C.*, which found juvenile courts enjoy "broad discretion to consider all evidence relevant to this inherently case-by-case determination," including all forms of delinquent behavior. (*D.C. v. Superior Court*, *supra*, 71 Cal.App.5th at p. 455.) We find persuasive the *D.C.* court's analysis of section 707's legislative history. The court there examined from when the five criteria were added in 1975 through legislative changes in 2015 concluding the history collectively "indicates an intent to maintain judicial discretion to consider all relevant evidence." (*D.C.*, at pp. 453-455.)

Minor contends this analysis is no longer appropriate because Senate Bill 545 "strengthen[ed] the value of the factors in assigning meaning to the criterion they support." But minor does not argue or present any legal support for the proposition that Senate Bill 545, discussed more fully *infra*, limited the juvenile court's discretion to

consider all relevant evidence.  Senate Bill 545 instead mandated courts consider any relevant factors while still leaving courts to decide what evidence is relevant.  (Legis. Counsel's Dig., Sen. Bill 545 (2023-2024 Reg. Sess.) Stats. 2023, ch. 716.)  This is further supported by the language in section 707 left unchanged by Senate Bill 545 stating juvenile courts consider the probation report and "any other relevant evidence." (§ 707, subd. (a)(3).)  Courts therefore still have discretion to consider all relevant evidence, and we conclude the juvenile court properly considered the full history of minor's delinquency.

Minor asserts for his final legal challenge to the juvenile court's analysis of this criterion that the juvenile court "misuse[d]" minor's capacity to do well in school.  But this was similar to the juvenile court's use of minor's intelligence for the criminal sophistication criterion, and we conclude it is similarly appropriate here.  In the context of the juvenile court's analysis of this criterion, it was not finding minor's scholastic aptitude supported transfer, but that the "little to no stability or encouragement" minor received only minimally mitigated the prior delinquency *because* of his recently displayed scholastic aptitude.  Indeed, the juvenile court did not find this criterion weighed in favor of transfer, indicating it believed minor's scholastic aptitude could not completely overcome the minimal stability of his home life.  We therefore conclude it was appropriate to use this fact to show other facts were nonmitigating in analyzing minor's prior delinquency.

4

*Substantial Evidence Supported The Juvenile Court's Delinquent History Finding*

Minor also challenges the underlying substantial evidence of the juvenile court finding this criterion neutral because "[*n*]*one* of this was evidence of unamenability . . . . [Minor's] misbehavior in school, regardless of its severity, does not independently inform this question."  But we have already found it does inform the question.  The Legislature has made one criterion for courts to consider in the amenability analysis "[t]he minor's

17

previous delinquent history." (§ 707, subd. (a)(3)(C)(i).) And as discussed, this includes any relevant delinquent history, including informal delinquent history. Because we reject these arguments, we conclude the juvenile properly considered minor's history of general delinquent behavior. However, because none of this behavior resulted in a formal petition, the juvenile court found this criterion weighed neutrally. This is supported by substantial evidence.

## D

### *The Juvenile Court's Gravity Of The Offense*
### *Criterion Finding Was Not Prejudicially Erroneous*

Minor's final attack on the juvenile court's criteria analysis is a legal challenge to the gravity of the offense criterion. Minor contends the juvenile court erred when it considered public safety for this criterion, because "public safety is not the immediate goal of the amenability scheme; rather, it is crafted to address a minor's well-being and chances of successful rehabilitation." We conclude any error harmless.

### 1

### *Relevant Background*

For the gravity of the offense criterion, the juvenile court found, "[B]eyond any doubt, . . . [minor] committed the offenses and enhancements alleged." The court added minor's "acts were intentional, extreme, callous, and designed to inflict great harm on multiple victims." The court then detailed the evidence of the shooting and its effects on the victims, including that minor "knew it was highly likely he would hit multiple victims," and "shot with full appreciation of the risk to human life and with intention to kill innocent individuals." The court further added, "Notably, there has been no evidence that [minor] has expressed any remorse or even regret for his actions." Thus, the juvenile court found "by clear and convincing evidence that [minor] is presently dangerous to this community, that his lack of concern for and disregard of the lives of others makes him an

18

ongoing risk to public safety.  [¶]  The circumstances and gravity of the offense alleged weighs heavily in favor of transfer to the criminal court."

### 2

### *Legal Standards*

When evaluating the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor," "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development."  (§ 707, subd. (a)(3)(E)(i)-(ii).)

### 3

### *Any Error In The Juvenile Court Analysis*
### *Of The Gravity Of The Offense Criterion Was Harmless*

We conclude any error on this issue harmless even under the stricter *Chapman* prejudice analysis.  (*Chapman v. California* (1967) 386 U.S. 18, 24 ["the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)  Even if a juvenile court may not consider future public safety concerns in analyzing the gravity of the offense criterion, the juvenile court's comparatively brief statements on public safety here came after a thorough analysis of the extensive and uncontested evidence of minor's violent behavior shooting into a crowded house.  Minor was in the house immediately before the shooting, thus imparting knowledge of likely victims, and then shot into the house until his gun ran out of ammunition.  There is strong evidence every listed factor within the criterion supported transfer:  minor's behavior, mental state, degree of involvement, level of harm caused, and mental and emotional development.  Both experts, including minor's own expert Dr. Ramezani, concluded this factor weighed in favor of transfer.  We therefore conclude, had the juvenile court not considered minor's risk to public safety, assuming that was improper, it is beyond a reasonable doubt it still

19

would have properly found this criterion weighed heavily in favor of transfer and would not have altered its overall analysis. Accordingly, the juvenile court did not err by transferring minor to adult court based on its gravity of the offense analysis.

II

*The Juvenile Court Did Not Make Evidentiary Errors*

Minor next challenges the expert testimony of both Dr. Urquiza and Detective Ditty. We will discuss each witness separately and conclude there was no reversible error.

A

*Legal Standards*

For the amenability decision, juvenile courts consider reports prepared by the parties and "any other relevant evidence." (Welf. & Inst. Code, § 707, subd. (a)(3).) Under the Evidence Code, " '[r]elevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)[3] Courts have discretion to exclude relevant "evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352.)

Witnesses may be qualified as experts if they have "special knowledge, skill, experience, training, or education sufficient to qualify [them] as an expert on the subject to which [their] testimony relates." (Evid. Code, § 720.) "A trial court's decision that a proposed witness qualifies as an expert under Evidence Code section 720 is a matter

---

**3**     It is not entirely clear strict adherence to the Evidence Code is required at an amenability hearing. (See *People v. Chi Ko Wong* (1976) 10 Cal.3d 698, 717 ["It is clear that the very nature of the fitness hearing precludes imposition of strict evidentiary standards"].) This issue is only briefly addressed in a footnote in minor's reply brief. Regardless, we apply the Evidence Code for the purposes of this opinion.

20

within the court's broad discretion and will not be disturbed on appeal unless the [minor] demonstrates a manifest abuse of that discretion." (*People v. Jones* (2013) 57 Cal.4th 899, 949.) Expert witness testimony is limited to opinions "[b]ased on matter . . . perceived by or personally known to the witness or made known to him[, her, or them] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his[, her, or their] testimony relates, unless an expert is precluded by law from using such matter as a basis for his[, her, or their] opinion [or opinions]." (Evid. Code, § 801, subd. (b).) Experts are not limited "to the use of admissible evidence in forming an opinion. [Evidence Code section 801] expressly provides the basis for the opinion must be reliable, 'whether or not admissible.' " (*Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, 887.) In short, "expert testimony can be based on a wide variety of information so long as it is reliable." (*Jones*, at p. 951.)

B

*There Was No Error In Admitting Dr. Urquiza's Testimony*

Minor first argues Dr. Urquiza "[r]endered neuropsychological opinions despite having admitted he lacked the expertise to do so." This misstates Dr. Urquiza's testimony. Dr. Urquiza never gave a neuropsychological opinion, and stated he does not personally administer the neuropsychological tests Dr. Ramezani uses because Dr. Urquiza is "not a neuropsychologist." Dr. Urquiza testified he had used the results from these tests to inform treatment and in minor's case Dr. Ramezani's tests were consistent with Dr. Urquiza's recommendations. At bottom, Dr. Urquiza testified to the extent his training and experience allowed.

Minor also argues Dr. Urquiza's testimony was inadmissible because he "never met with [minor], interviewed him, or performed tests," nor did Dr. Urquiza request consent to evaluate minor, and the prosecutor did not "exercise any existing statutory mechanisms [that] might have given the doctor access to [minor]." But minor does not

21

provide any statutory requirement Dr. Urquiza interview him. Instead, "[i]t is the long-standing rule in California that experts may rely upon and testify to the sources on which they base their opinions [citations], including hearsay of a type reasonably relied upon by professionals in the field. [Citations.] *These rules apply to mental health experts*." (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747, italics added.) We conclude there was no error admitting Dr. Urquiza's testimony even though he did not personally interview minor. Dr. Urquiza's failure to interview minor is relevant to weight not admissibility.

Minor's final two contentions on this issue are related: Dr. Urquiza (1) did not obtain consent from minor to evaluate him and (2) "[e]ngaged in harmful advocacy against [minor]." Both arguments are based on alleged violations of the American Psychological Association's Ethics Code, such as the obligation to "minimize harm where it is foreseeable and unavoidable." (American Psychological Assoc., Ethical Principles of Psychologists and Code of Conduct (2017) § 3.04(a) <https://www.apa.org/ethics/code> [as of Mar. 20, 2025], archived at <https://perma.cc/Y5AG-ZKMB>.) But we are not tasked with reviewing a violation of professional ethics. Our job is to determine the legal issue of whether Dr. Urquiza's testimony is admissible. And nowhere in the Evidence Code, or any other applicable legal authority provided by minor, requires a psychologist to obtain consent from the subject of expert testimony before delivering an opinion in court, nor that this opinion cannot be that a minor is not amenable to rehabilitation. We therefore conclude the juvenile court did not abuse its discretion by permitting Dr. Urquiza to testify on the matters that he did.

C

*There Was No Reversible Error Admitting Detective Ditty's Testimony*

Minor also makes several challenges to Detective Ditty's testimony. First, minor argues, "[L]arge portions of Detective Ditty's information consisted of restatements from reports or footage [that had] already been admitted, but through his own subjective filter,"

22

thus "it was irrelevant." Again, "expert testimony can be based on a wide variety of information so long as it is reliable." (*People v. Jones*, *supra*, 57 Cal.4th at p. 951.)[4] Minor does not challenge the reliability of the bodycam footage, police reports, and other evidence Detective Ditty reviewed. We therefore reject this first challenge to Detective Ditty's testimony.

Second, minor contends, "[T]he detective lacked the qualification to provide criminal street gang evidence." We disagree. Detective Ditty was a 10-year veteran police officer with three of those years serving in the unit specifically responsible for gang investigations in Chico. Officer Ditty also received gang training prior to him testifying, including a 40-hour gang specific training. This background establishes the juvenile court did not demonstrate a manifest abuse of discretion in finding Detective Ditty had special knowledge, skill, and training relating to gangs in Chico. And Detective Ditty's testimony regarding minor's potential gang involvement was relevant to the criminal sophistication and gravity of the offense criteria.

Finally, minor contends, "Detective Ditty's subjective and inflammatory opinions on [minor's] psychology had no place in this proceeding." Minor refers to statements made in Detective Ditty's report such as minor " 'selfishly fulfilled his own egotistical need . . . to be a criminal/gangster' " and the shooting also " 'gave [minor] the criminal/gang street credit he so desperately idolized." Before closing arguments, defense counsel objected to admission of the report based on these statements being irrelevant and lacking foundation. The juvenile court took it under submission and ultimately admitted the report, finding most "if not wholly" the contents of the report were presented by other means of evidence, including "video evidence that did overlap the summation of Detective Ditty's narrative in that investigative report."

---

[4] Minor does not challenge any expert witness testimony under *People v. Sanchez* (2016) 63 Cal.4th 665.

23

We conclude any error on this last issue harmless even under the stricter *Chapman* prejudice analysis. (*Chapman v. California*, *supra*, 386 U.S. at p. 24 ["the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) Even assuming the statements minor challenges in Detective Ditty's report were outside the bounds of his expertise, lacked foundation, and were irrelevant, they were inconsequential in the context of the entirety of the evidence. The statements were included in a report, not made by Detective Ditty at the hearing, and were obvious subjective interpretations of the video evidence the juvenile court reviewed and analyzed for itself. And this video evidence showed minor being combative with law enforcement officers on multiple occasions while using words and wearing colors of the Crip gang, and showed minor firing multiple rounds into a crowded party. The juvenile court was consequently presented with the compelling, and reliable, primary sources of Detective Ditty's statements that would have beyond a reasonable doubt rendered inconsequential any additional commentary Detective Ditty provided. Thus, any error in admitting Detective Ditty's opinions contained in his report was harmless.

III

*Remand Is Not Required In Light Of Senate Bill 545*

Minor's 2023 hearing took place prior to the enactment of Senate Bill 545, which amended section 707 to "make consideration of any relevant factor mandatory." (Legis. Counsel's Dig., Sen Bill 545 (2023-2024 Reg. Sess.) Stats. 2023, ch. 716.) We agree with the parties that the amendment, by "mak[ing] it more difficult to transfer juveniles from juvenile court, which . . . reduces the possible punishment for juveniles" (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1289), is an ameliorative statute that applies retroactively to minors whose cases were not final when the law became effective (see *ibid.*; *In re J.M.* (2024) 103 Cal.App.5th 745, 753, review granted Sept. 25, 2024, S286259).

Nevertheless, it does not follow remand is required to allow the juvenile court to conduct a second transfer hearing. Our Supreme Court explained in the context of a

24

change in sentencing law that when an ameliorative statute takes effect after the juvenile court has made a ruling, " 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the [juvenile] court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 425.)  Both sides agree, as do we, the analysis is the same for the change in law at issue here, and the same standard applies.

Minor contends he is entitled to a new transfer determination because it is unclear whether the juvenile court would make the same decision had it understood its duty to weigh the statutory considerations when making its ruling.  We disagree.  The juvenile court recited each criterion and the relevant factors while analyzing the facts of minor's case.  The juvenile court's oral recitation of its reasons demonstrates the relevant factors weighed in the court's mind when making its ruling.  For example, when determining the level of criminal sophistication exhibited by minor, the juvenile court analyzed the statutory considerations, including minor's age, maturity, intellectual capacity, physical and emotional health, and appreciation of the risks and consequences of his behavior.  The same level of engagement occurred with each criterion and the now mandatory factors.  Thus, this is not a basis for remand.

Minor further argues he is entitled to a new transfer determination because Senate Bill 545 added relevant factors to the transfer analysis.  Minor points to the fact the juvenile court must now consider whether minors were involved in the child welfare or foster care system or a victim of sexual abuse or trafficking.  Minor concedes he was never involved in the child welfare system, and he does not contend he is a victim of sexual abuse or trafficking, but argues the "*lack* of involvement" is relevant because of "the functional absence of the child welfare system from [minor's] life, despite multiple points at which involvement was plainly necessary."  We reject this novel argument because it is against the language of the statute.  After Senate Bill 545, juvenile courts are

25

mandated only to consider, if relevant, *involvement* in the foster care system, not *lack* of involvement. (§ 707, subd. (a)(3)(A)(ii).)

Accordingly, the record clearly indicates the juvenile court would have reached the same conclusion had it been aware of current law.

IV

*Substantial Evidence Supported The Juvenile Court's Overall Analysis*

Minor finally argues the juvenile court's overall decision to transfer minor lacked substantial evidence. This argument rests on two premises. First, minor contends the errors discussed above individually and collectively eliminated any substantial evidence justifying transfer, including the testimony from "two highly suspect experts," neither of whom "contributed to the already limited body of admissible evidence that arguably supports transfer," and the lack of evidence supporting the juvenile court's "discussion of criminal sophistication." For the reasons discussed above, we found no prejudicial error and so reject these bases to undermine the overall finding.

Second, minor reweighs the evidence, arguing "this was *not* a 'close case' " because "[e]veryone who *actually knew anything* about [minor] consistently praised his post-detention rehabilitative efforts and offered a concretely positive view of his future." Even if there is substantial evidence supporting a decision not to transfer minor, that is not our inquiry here. The juvenile court found there was clear and convincing evidence supporting transfer so we must affirm if there is substantial evidence supporting transfer at the requisite level of certainty. Having already concluded there is substantial evidence for the criteria the juvenile court found supported transfer, and minor not presenting any new arguments against the evidence supporting the juvenile court's finding, we must conclude there was substantial evidence supporting the juvenile court's overall finding minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.

## DISPOSITION

The juvenile court's order transferring minor to a court of criminal jurisdiction is affirmed.

/s/_____
ROBIE, J.

We concur:

/s/_____
HULL, Acting P. J.

/s/_____
KRAUSE, J.